In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 04-2086

MAHAMAT DJOUMA,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

_____

On Petition to Review an Order of the
Board of Immigration Appeals.
No. A75 408 106

_____

ARGUED OCTOBER 18, 2005—DECIDED NOVEMBER 15, 2005

_____

Before POSNER, KANNE, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* The immigration judge rejected Mahamat Djouma's claim of asylum and ordered him removed (deported), and the Board of Immigration Appeals summarily affirmed. Djouma is a citizen of Chad, and the nephew of a man named Mahamat Garfa. In 1994, Garfa, formerly the nation's army chief and later its minister of mines and energy, fled Chad, either because he was suspected of embezzling government funds or because of political disagreement with the country's president; perhaps both were factors. In exile he became, and so far as appears remains, active in a movement to forcibly overthrow the

existing regime in Chad. Immediately after Garfa fled Chad, Djouma was arrested, jailed, interrogated about Garfa's whereabouts, whipped, and after four days released when a friend of his uncle's bribed a guard. Djouma fled to another African country, Cameroon, and remained there for two years, without seeking asylum in that country, before coming to the United States. After landing here, he went to Canada and applied for asylum together with a cousin who had been arrested in Chad at the same time as Djouma. A Canadian immigration judge turned down their applications and Djouma then returned to the United States and applied for asylum here.

The bulk of the (U.S.) immigration judge's opinion is devoted to the issue of Djouma's credibility, and here the judge stumbled. She began by noting that the Canadian immigration judge had found the cousins' story incredible, in part because they had given different descriptions of Garfa's house in which they had been living when they were arrested. But Djouma testified in the present proceeding that the reason for the discrepancy was that Garfa had two wives and two homes (one for each wife), and that the cousins had not been living in the same one, so naturally their descriptions differed. The immigration judge thought it incredible that the cousins' Canadian lawyer would not have told the Canadian immigration judge this if it were true. But the only evidence bearing on that question is a garbled transcript of the Canadian immigration hearing, with missing pages and mysterious references, such as the reference to "a rather meek explanation as to the variable nature of the eating location within the home." If the U.S. immigration judge wanted to rely on the Canadian proceeding to help her resolve the question of Djouma's credibility, she should at least have ordered a complete copy

of the hearing transcript from the Canadian immigration authorities.

She also thought it suspicious that Djouma had not applied for asylum in Cameroon. Djouma testified that the reason he didn't is that he believed that Cameroon turns down all asylum applications, so that the only consequence of his applying for asylum would have been deportation to Chad. The judge gave no reason for thinking that Djouma was misrepresenting his belief; nor was any other evidence concerning Cameroon's policy on asylum presented. The judge also thought it incredible that Djouma could find his uncle in Benin, to which the uncle had fled, by looking him up in the phone book. (Djouma's purpose was to elicit a letter from his uncle supporting his application for asylum; the uncle obliged.) The judge thought that since the uncle was wanted by Chad, he would conceal his presence in Benin. But whether he would or would not would depend on factors that the judge did not mention, such as relations between Benin and Chad (maybe Benin is hostile to Chad and happy to provide protection to the enemies of the Chadian regime—another matter on which the record is silent) and whether Chad's security service hunts down enemies of the nation in Benin.

We understand the dilemma facing immigration judges in asylum cases. The applicant for asylum normally bases his claim almost entirely on his own testimony, and it is extremely difficult for the judge to determine whether the testimony is accurate. Often it is given through a translator, and even if the applicant testifies in English, as a foreigner his demeanor will be difficult for the immigration judge to "read" as an aid to determining the applicant's credibility. Unfortunately, the Department of Homeland Security and the Justice Department, which share responsibility for

processing asylum claims, have, so far as appears, failed to provide the immigration judges and the members of the Board of Immigration Appeals with any systematic guidance on the resolution of credibility issues in these cases. The departments have not conducted studies of patterns of true and false representations made by such applicants, of sources of corroboration and refutation, or of the actual consequences to asylum applicants who are denied asylum and removed to the country that they claim will persecute them. Without such systematic evidence (which the State Department's country reports on human rights violations, though useful, do not provide), immigration judges are likely to continue grasping at straws—minor contradictions that prove nothing, absence of documents that may in fact be unavailable in the applicant's country or to an asylum applicant, and patterns of behavior that would indeed be anomalous in the conditions prevailing in the United States but may not be in Third World countries—in an effort to avoid giving all asylum applicants a free pass. The departments seem committed to case by case adjudication in circumstances in which a lack of background knowledge denies the adjudicators the cultural competence required to make reliable determinations of credibility.

The immigration judge had, however, an alternative ground for denying Djouma's claim of asylum, which is that he had failed to prove that he had been persecuted or was likely to be if he returned to Chad. So far as appears, the only interest the Chadian government had in Djouma was that it thought he might know where Garfa had fled to. That was eleven years ago. If Garfa is still in the Benin phone book, Chad has no further interest in Djouma; if Garfa is once again in hiding, there is no indication that Djouma knows where he is.

But a deeper point is that if Chad's only interest in Djouma is as a material witness to Garfa's location, Djouma is ineligible for asylum. Being a material witness, even to a political crime (such as insurrection), is no more a status that the asylum law protects than being a criminal suspect is—even a suspect in a political crime. *Lwin v. INS*, 144 F.3d 505, 509 (7th Cir. 1998); *Dinu v. Ashcroft*, 372 F.3d 1041 (9th Cir. 2004); *Shardar v. Ashcroft*, 382 F.3d 318, 323-24 (3d Cir. 2004); cf. United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* ¶ 84 (HRCP/IP/4/Eng/Rev.1 Jan. 1992). Only persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion" can support a claim of asylum. 8 U.S.C. § 1101(a)(42).

It is not as if Djouma shared Garfa's political views or belonged to his movement, and was complaining that Chad would persecute him on account of his politics; that would be a valid basis for seeking asylum. Moreover, the term "membership in a particular social group" would cover this case regardless of Djouma's political activities or opinions if Chad had decided, as a method of collective punishment of its political enemies, to persecute the members of their families. *Lwin v. INS, supra*, 144 F.3d at 509-13; *Bernal-Rendon v. Gonzales*, 419 F.3d 877, 881 (8th Cir. 2005); *Lopez-Soto v. Ashcroft*, 383 F.3d 228, 235-38 (4th Cir. 2004); *Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir. 1993). But there is no indication of that; several members of Djouma's (and therefore Garfa's) family remain in Chad, apparently undisturbed.

Oddly, although Djouma's brief does not argue for relief under the Convention Against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85 (1984); see 8 C.F.R. §§ 208.16, 208.18, 1208.16, 1208.18, the government argues that he is not entitled to such relief. It relies on the immigration judge's finding that although Djouma "claims that he was whipped [during his four days in jail], there is no indication in the file whatsoever that he was in need of medical treatment or that he suffered any damage as a result of the mistreatment while held in jail." The immigration judge seems to have thought that in being whipped, Djouma had merely been "harassed." Skilled torturers leave no marks on the victim's body, however; and there is a level of whipping that amounts to torture even under the Convention's restrictive definition of "torture." 8 C.F.R. §§ 208.18(a)(1),(a)(2); see *Prela v. Ashcroft*, 394 F.3d 515, 519 (7th Cir. 2005); *Nuru v. Gonzales*, 404 F.3d 1207, 1218 (9th Cir. 2005); cf. *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992). Moreover—and this could be critical in a case such as this—the Convention does not protect only victims of persecution. E.g., *Niang v. Gonzales*, 422 F.3d 1187, 1196 (10th Cir. 2005).

Djouma's problem, and the reason his lawyer sensibly abandoned any CAT claim, is that Djouma cannot show that "it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2); *Comollari v. Ashcroft*, 378 F.3d 694, 695 (7th Cir. 2004). In fact, since it is unlikely that he has any information of interest to the Chadian authorities, it is more likely than not that he will not be tortured.

The petition for review is therefore

DENIED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*