In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2074

AN NA HUANG and
ZHOU WU DONG,

*Petitioners,*

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent.*

———————

Petition for Review of an Order of the
Board of Immigration Appeals.
Nos. A96-171-594 & A78-433-179

———————

ARGUED FEBRUARY 15, 2008—DECIDED MAY 8, 2008

———————

Before FLAUM, WOOD, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.* An Na Huang and Zhou Wu Dong are both natives and citizens of China. They applied for asylum, withholding of removal, and relief under the Convention against Torture, alleging that they had been persecuted and tortured on account of Huang's pregnancy prior to having obtained a legal marriage, and the couple's refusal to pay the accompanying fine. The Immigration Judge found that petitioners' asylum claims were untimely, and that the remainder of their claims failed due

to lack of credibility and evidence. We agree, and therefore deny the petition for review.

## I. Background

Before coming to the United States, Huang lived in Lian Jiang County, Fujian Province, China. She worked as a self-employed seamstress. On January 1, 1996, at age 19, she married Dong in a traditional Chinese ceremony. The couple did not register their marriage and obtain a license[1] because she was underage at the time.[2] After Huang and Dong married, they lived in his parents' home in the village of Guantou Town. Huang testified that she remained registered with her parents' household, and would occasionally visit them in the nearby village of Dong Xi.

In December 1995, prior to their traditional marriage, Huang claims that she learned that she was pregnant after a visit to a private doctor. A few months after their marriage, on March 5, 1996, at approximately 8:00 AM, Huang testified that Family Planning officials arrived at her husband's parents' home. They told her that they

---

[1] Huang and Dong testified that they attempted to register their marriage in May of 1998 but were turned down because she married underage. On October 8, 2002, the couple legally married in Brooklyn, New York, under the laws of the United States.

[2] Under the National Marriage Law, the minimum age for marriage in China is 20 for females and 22 for males. BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR, U.S. DEP'T OF STATE, CHINA: PROFILE OF ASYLUM CLAIMS AND COUNTRY CONDITIONS 22 (June 2004) [hereinafter COUNTRY REPORT].

knew she was culturally wedded to her husband and that she was eligible for a routine medical exam. Alone at the time, Huang submits that she was forcefully taken to the Lian Jiang County Hospital where her pregnancy was discovered. She says that she was then pushed down on an operating table, made unconscious, and subjected to an abortion procedure. Afterwards, she requested a certificate from the hospital stating that she had gone through this procedure and that she should be allowed to rest for seven days. Huang testified that the entire process—from the officials arriving at the home to her discharge from the clinic—took two-and-a-half hours.

Two days later, Huang claims to have received a hand-delivered notice of a fine from the Guantou Town Birth Control Office demanding that she pay 3000 yuan renminbi ("RMB") for violating the Fujian Province Birth Control Policy. This fine—equivalent to about 370 dollars—was about as much as the couple's annual income. They decided to forgo paying the fine, and three days later, a Public Security Bureau messenger delivered a summons to the home in Dong's name. While it does not state it, we assume that the summons was issued for failure to pay the fine. Instead of reporting to the Public Security Bureau as requested, Dong went into hiding in Fuzhou City. He returned on March 25, 1996, after hearing that his mother had fallen ill. Thirty minutes after his arrival, at 8:00 AM, two officials from the Public Security Bureau and one from the Birth Control Office came to the house and arrested him. Dong submits that he was taken to the Lian Jiang County Jail where he remained for a year. During his detention, he claims that he was tortured, specifically by having electricity applied to his genitals. Dong was released on March 27, 1997. Huang asserts

that she attempted to pay the fine earlier while Dong was in jail, but authorities told her that he was to remain detained for a full year. The receipt from the payment to the Birth Control Office indicates that Dong was the payor, and that the reason for collection of payment was "early birth without marriage."

After Dong was released from prison, the couple continued to live in his parents' home until June 2000. At that time, Dong paid $50,000 to a member of the Snakehead gang to be smuggled into the United States. Huang followed suit and also paid $50,000 to a Snakehead to get smuggled into the United States in February 2002. She claims that her precise date of entry was February 14, 2002. The couple has two children, both of whom were born in the United States. The first was born on January 2, 2003, and the second was born on March 29, 2004.

On August 6, 2002, the Immigration and Naturalization Service ("INS") issued Dong a Notice to Appear, charging him with removability pursuant to 8 U.S.C. § 1227(a)(1)(A). Huang filed an application for asylum with the Department of Homeland Security ("DHS") on February 13, 2003.[3] Later, on March 24, 2003, she too was charged with removability. Both Huang and Dong conceded that they were removable. Their cases were consolidated, and a merits hearing on Huang's application for asylum was held on September 29, 2005. The Immigration Judge ("IJ") issued a decision denying all relief and ordering both Huang and Dong removed to China. The Board of Immigration Appeals ("BIA") agreed with the IJ, and Huang and Dong now present their petition for review.

---

[3] Dong also filed an application for asylum in 2003.

## II. Discussion

Huang and Dong argue that the IJ erred in denying their claims involving asylum, withholding of removal, and the Convention against Torture ("CAT"). We analyze each issue in turn.

### A

The Immigration and Nationality Act ("INA") gives the Attorney General discretion to grant asylum to an alien who qualifies as a refugee, which refers to an alien who is unwilling or unable to return to her home country "[b]ecause of persecution or a well-founded fear of perse-cution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). But there are limits to this protection. The INA requires that asylum applications be filed within one year of an alien's arrival in the United States. 8 U.S.C. § 1158(a)(2)(B). The alien must prove that she has timely filed her application by clear and convincing evidence. *Id.* The only exceptions to the deadline are changed circumstances materially affecting eligibility for asylum, or extraordinary circumstances relating to the delay in filing the application. *Id.* at § 1158(a)(2)(D).

In this case, the IJ found that each of the petitioners' asylum applications were untimely. Dong's only explana-tion for filing three years after his arrival was that he did not know that asylum was available. On appeal, petitioners do not appear to argue that this is a valid justification for making an exception to the one-year time bar. Instead, they seem to implicitly rely on 8 U.S.C. § 1158(b)(3)(A), which would allow Dong to derivatively obtain asylum through Huang. This of course assumes that

Huang proved by clear and convincing evidence that she timely filed her asylum application. We agree with the IJ that she did not succeed in doing so. Huang insists that she arrived in the U.S. on February 14, 2002—just one day under the deadline—and she knew that this was the date because she was told it was Valentine's Day. A romantic notion no doubt, but in spite of the fact that she has now been living in the U.S. for a number of years since her arrival, she has not mustered any evidence evincing that she arrived on or around this date. There is no documentation, valid or counterfeit, to indicate when she may have arrived. Indeed, when asked about the passport she used to enter the country, she stated that she gave it back to the smugglers. Huang also claims that she used her own passport to leave China, but gave that to the smugglers too, thereby leaving doubt as to when precisely she left China. In lieu of documentary evidence, she could have provided anecdotal evidence from relatives or acquaintances about her date of arrival or departure. She failed to do this as well. Thus we are left with nothing more than her own testimony that she knew she arrived on February 14, 2002 because she was told it was Valentine's Day. This in and of itself—particularly given the amount of time she has now spent in the U.S.—does not add up to clear and convincing evidence regarding her date of arrival.

Since petitioners cannot pass this statutory bar, they argue in the alternative that the IJ's ruling on asylum raises a "question of law," and so we are not precluded from having jurisdiction to hear their claim. Indeed, under the INA, "[n]o court shall have jurisdiction to review any determination of the Attorney General" regarding timeliness of applications for asylum. 8 U.S.C. § 1158(a)(3).

It is true that the Real ID Act amended the judicial review provisions of the INA to allow review of constitutional claims and questions of law. *See, e.g., Ramos v. Gonzales*, 414 F.3d 800, 801-02 (7th Cir. 2005). Nevertheless, we have squarely held that an IJ's determination that an asylum application is untimely is a factual determination, and does not raise a question of law. *See Vasile v. Gonzales*, 417 F.3d 766, 768 (7th Cir. 2005) ("Perhaps Vasile would like to shoehorn his [untimely asylum] claim into the 'question of law' category, but it simply does not fit there.").

There is yet another threshold issue that keeps this Court from assessing the merits of petitioners' asylum claim: they did not exhaust their administrative remedies. Specifically, Huang and Dong did not raise the time bar issue to the BIA. In their first appeal, they simply made the broad argument that the IJ's decision was "contrary to the law and facts of the case." Petitioners argue that this generalized statement is enough to have raised the time bar issue before the BIA. We disagree. Their Notice of Appeal and brief below do not raise any arguments regarding the time bar. The concept is not even mentioned. Petitioners jumped straight into the merits of their claim without raising the threshold issues. Indeed, the BIA explicitly noted in its order that "the respondents have not specifically challenged the denial of asylum on the 1-year ground." Hence, because petitioners failed to exhaust their administrative remedies, we cannot reach the merits of their asylum claim. *See Capic v. Ashcroft*, 355 F.3d 1075, 1087 (7th Cir. 2004).

**B**

Apart from their asylum claims, Huang and Dong assert that removal should be withheld and that sending them back to China would violate our commitments under the CAT. Withholding of removal prevents the Attorney General from deporting an alien to a country where her life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3). To establish eligibility for withholding of removal here, petitioners must demonstrate a clear probability that they will face persecution if they are removed to China. *See Pavlyk v. Gonzales*, 469 F.3d 1082, 1087 (7th Cir. 2006). Past persecution "may imply a future threat and so require the agency to demonstrate that conditions have improved, . . . [but] the focus remains on what is likely to happen following an alien's return home." *Kobugabe v. Gonzales*, 440 F.3d 900, 901 (7th Cir. 2006). With respect to the CAT, an alien must establish by objective evidence that it is more likely than not that he or she would be tortured[4] if returned to the proposed country of removal. 8 C.F.R. § 1208.16(c)(2). We review the IJ's factual findings deferentially, and "inquire only whether the Board's decision

---

[4] The regulations define torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . punishing him or her for an act he or she or a third person has committed or is suspected of having committed or intimidating or coercing him or her or a third person . . . ." 8 C.F.R. § 1208.18(a)(1). This torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id*.

has the support of 'reasonable, substantial, and probative evidence on the record considered as a whole.' " *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). An IJ's adverse credibility determination is upheld so long as it is supported by "specific, cogent reasons" and bears a "legitimate nexus to the finding." *Shtaro v. Gonzales*, 435 F.3d 711, 715 (7th Cir. 2006).

We are satisfied that there was a substantial basis for the IJ to conclude that the petitioners were not credible. For instance, Huang and Dong were not fully able to explain why they would each pay $50,000 to get smuggled into the U.S., but why they could not afford (or find resources to pay) the $370 fine. Some support for this inconsistency can be found in Huang's testimony, where she stated that greater economic opportunity was part of her motivation for coming to the U.S. But there are other, more telling inconsistencies as well. The abortion certificate that Huang presented as evidence for her claim, for example, is generally only given to individuals who undergo a voluntary abortion, so that they may give it to their employer to get leave to rest. COUNTRY REPORT at 22-23. Huang did not claim to have a voluntary abortion, and, perhaps more significantly, she was self-employed. The fine associated with this procedure stated that it was for "early birth without marriage," but there was no birth. In general, petitioners have not presented an adequate explanation for why they would be required to pay a social compensation fee when no child was born. Also, it was unclear why Dong would be summoned to the Public Security Bureau when Huang was the one who became pregnant and who was specifically named in the notice of the fine. With respect to Dong's time in

prison, it was curious that he omitted any claims of torture in his initial asylum application, and offered as his reason that he was not asked about it. And the detention notice that he claims he kept with him in jail for the entire year is, according to evidence in the record, never given to the individual who is detained. The timing of certain events also raised suspicion with respect to the veracity of petitioners' story. Huang's pregnancy and the couple's cultural marriage were discovered by Family Planning officials—in a different village—rather swiftly. This was in spite of the fact that Huang saw a private doctor, not a government doctor. Additionally, while it may be entirely plausible, it is a little difficult to imagine that Dong would be arrested only thirty minutes after having returned to town from ten days of hiding.

There are problems with petitioners' story independent of the narrative. A DHS forensic documents examiner found that the very documents Huang and Dong used to lend credence to their claims were not authentic or genuine. Specifically, petitioners submitted five documents as evidence: the birth control surgical certificate, the birth control violation fee, a notice to Huang, the Lianjiang Public Security Bureau detention notice, and the police summons. The first three documents could not be authenticated, which means that there were no indicia of legitimate production. As the forensic examiner put it, "[a]nybody anywhere could have produced these documents." The last two documents were found to be not genuine.[5] Moreover, the forensic examiner believed that

---

[5] The phrase "not genuine" is a term of art used by the forensic examiner and is distinct from the concept of a "counterfeit"

(continued...)

they had been artificially aged. Huang and Dong did not present any testimony—or even an argument—to rebut this evidence. Since these documents formed the key-stone of their story, and since petitioners emphasized that the documents were personally obtained, it was appropri-ate for the IJ to tack their lack of authenticity onto his adverse credibility determination. *See Matter of O-D-*, 21 I&N Dec. 1079, 1084 (BIA 1998). In summary, because petitioners' were not found to be credible, they cannot meet the burden of proof on their withholding of re-moval and CAT claims by showing past instances of persecution and/or torture. With respect to what is likely to occur when petitioners return to China, particularly since they had two children in this country, U.S. Depart-ment of State Reports suggest that families with children abroad are generally assessed social compensation fees. COUNTRY REPORT at 24 Again, Huang and Dong have not presented any evidence to contradict this view.

_____

[5] (...continued)

document. If we imagine a spectrum of authenticity, a counter-feit document would be at one end of the spectrum. In that case, the examiner would have an exact copy of the document from the same location (e.g., Lianjiang jail), and could compare the proffered document to see whether it matches. Or, the examiner would have substantial information that the docu-ment is standardized everywhere, regardless of location, and so any deviation from this standard form would be deemed counterfeit. The designation "not genuine," on the other hand, applies to documents where there is no exact specimen from the same location that can be used for comparison. Instead, there are standardized forms used throughout the country, and these are used for comparison, but there is not crystal clear evidence that the standardized forms are used in all locations.

While we therefore agree with the IJ's conclusions regarding withholding of removal and CAT, we pause to note one methodological flaw in the opinion below. The IJ found that one additional reason Huang was not to be believed was that she declared that her entire forced abortion incident—from the time she was picked up by officials to the time she was discharged—took two-and-a-half hours. While the record is not clear on this point, we can infer about thirty minutes associated with travel time. That leaves about two hours. There is nothing in the record to indicate precisely what type of abortion procedure Huang allegedly went through. The IJ does not cite to any medical evidence whatsoever to support his incredulity at the notion that a patient could be given a pregnancy test, anesthetized, subjected to the procedure, and then sent home all in a matter of one-and-a-half hours. This appears to be a questionable assumption, particularly since our research indicates that a dilation and curettage procedure,[6] for instance, can be performed in fifteen minutes. *See* Richard S. Guido, M.D. & Dale W. Stovall, M.D., *Patient Information: Dilation and Curettage (D & C)* (William J. Mann, Jr., M.D., ed., 2006), www.uptodate.com. Hence, we urge caution when drawing adverse inferences of this nature in medically sensitive cases.

---

[6] This procedure involves expanding the entrance of a woman's uterus so that a thin instrument can be used to scrape away the lining of the uterus.

### III. Conclusion

For the foregoing reasons, the petition for review is DENIED.

USCA-02-C-0072—5-8-08