NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 3, 2009
Decided April 2, 2009

**Before**

WILLIAM J. BAUER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

No. 08-2088

| | |
|---|---|
| BHAVESHBHAI PATEL, <br> *Petitioner*, | Petition for Review of an Order of the <br> Board of Immigration Appeals |
| *v.* | No. A97-333-104 |
| ERIC H. HOLDER, JR., Attorney General <br> of the United States, <br> *Respondent*. | |

**O R D E R**

Bhaveshbhai Patel fears that, if he returns to his native India, he will be persecuted by either the Hindus or the Muslims for testifying—or not testifying—in a possible criminal trial about a violent murder he witnessed in which five Hindus killed a Muslim man. Facing an order of removal, Patel applied for withholding of removal and protection under the Convention Against Torture ("CAT"), claiming fear of religious persecution. The IJ denied Patel's application, concluding that the persecution Patel feared was based not on his religion, but rather the retribution he was likely to encounter as a result of being forced to

testify. The BIA affirmed. Because substantial evidence supports the BIA's decision, we deny Patel's petition for review.

Until he came to the United States, Patel had lived his entire life in Gujarat, a western state in India that borders Pakistan that has been plagued by ethnic violence. See generally Martha C. Nussbaum, *The Clash Within: Democracy, Religious Violence, and India's Future* (2007). In 1999 a riot broke out in Gujarat, and during the riot Patel witnessed five Hindus burn a Muslim man alive. Patel took no part in the riot and afterwards went directly home, where police later approached him and confirmed that he was a witness to the event. Several months later the government ordered him to testify about the murder. After he received this request, Patel says that he was visited by individual members of the Hindu and Muslim communities. Hindus warned that if he testified against fellow Hindus, he would be shunned by his community. Muslims warned that if he refused to testify, he and his family would be harmed—and specifically they threatened to kidnap his sister and rape her. Fearing reprisal no matter what he did, Patel decided to leave India. After staying with a friend in a small village outside Bombay for six months, he left for America.

In 2000, at the age of 21, Patel entered the United States near El Paso, Texas, without inspection or a visa. It is unclear from the record how Patel came to the attention of the Department of Homeland Security (DHS), but DHS caught up with him in 2005 and issued a warrant for his arrest based on his status as an illegal alien. After his arrest, Patel filed an application for asylum, withholding of removal, and CAT protection. In his application he claimed that he feared returning to India because of harm he faced from either the Hindus or Muslims for any role he might play as a witness to the murder. Patel acknowledged at a preliminary hearing that he had not filed his asylum application within one year of entering the United States, and therefore was eligible only for withholding of removal and CAT protection.

Before Patel's removal hearing, the government supplemented the record with the 2005 International Religious Freedom Report and 2005 Report on Human Rights Practices from the Department of State. These reports confirmed that indeed tensions between Hindus and Muslims ran high—particularly so in Gujarat, where the Hindu-dominated government was at times unable to stem the tide of Hindu-Muslim violence. The Religious Freedom Report documented the investigation and prosecution of 21 Hindus accused of burning several Muslims in Gujarat after the notorious 2002 riots. See Nussbaum, *supra, The Clash Within*, ch. 1. After the trial, more than half of the 73 witnesses recanted their stories after having been threatened—confirming Patel's claim that pressure may be brought to bear on witnesses in inter-religious cases. But the report also noted that the Gujarat government has been generally more conscientious in dealing with Hindu-Muslim prosecutions, and to that end, has managed to convict 13 Hindus in connection with anti-

Muslim violence and has asked that nine high-profile cases involving Hindu-Muslim violence be transferred out of Gujarat in 2002.

At his removal hearing Patel testified that he feared persecution from the Hindu and Muslim communities if he returned to India, but he provided few details to corroborate his claim. He testified that after the Hindus and Muslims threatened him, he "became completely confused" about whether to testify and, unable to decide, chose to leave India. Patel did not describe any incidents of actual abuse, nor did he mention any threats based on his religion *per se.* Rather his fear centered on his decision whether to testify: "[I]f I don't go to the court the Muslims will harm me and if I go to the court then the Hindus will harm me by putting me out of my religion." Patel's attorney later clarified that Patel's fear of persecution was religiously based because, he contended, if Patel were Christian rather than Hindu, he would not be fearful of testifying. As the lawyer explained it, the principal animosity lies between the Hindu and Muslim groups, not others; thus a Christian's act of testifying in support of the Muslim victims (unlike a Hindu's) would not be seen as traitorous. Patel added that he believed he would be forced to testify if he returned and that the threat posed by Hindus and Muslims is ongoing. He noted that his parents, who are still living in India, informed him that Muslims continue to inquire about his whereabouts and that they are fearful of the Muslims who visit them. Finally, Patel acknowledged that he had never gone to the court and, in fact, did not even know if an official prosecution was underway.

The IJ denied Patel's requests for withholding of removal and CAT relief. Regarding Patel's withholding claim, the IJ concluded that he did not qualify because he failed to prove that it was more likely than not he would be persecuted on account of his religion if he returned to India. The IJ questioned Patel's credibility, finding it implausible that "unknown Muslims," motivated by an event that occurred several years ago, would go to his parents' home to inquire of his whereabouts. And even if Patel's claims were credible, the IJ added, he had not alleged a fear of persecution "on account of" a protected ground such as religion. Rather, the "primary motivation" for Patel's flight from India was his fear of testifying as a witness in a possible criminal trial. The IJ also characterized Patel's fear as a fear of "general violence," and noted that Patel had not pointed to any specific circumstances he faced that would qualify him for relief. Finally, the IJ concluded that Patel had not established that the government of India was either unwilling or unable to quell any violence Patel might face due to his testimony. For the same reasons, the IJ ruled that Patel failed to meet the higher standard of proof required for CAT protection.

Patel appealed to the Board of Immigration Affairs, which affirmed the decision of the IJ. The BIA too thought that even assuming the truthfulness of Patel's testimony, he did not show he had a well-founded fear of future persecution based on a protected ground.

The BIA reasoned that Patel feared persecution based on his decision whether to testify—a fear only tangentially connected to his religion—and that this fear did not qualify him for relief from removal. The BIA also agreed with the IJ's conclusion that Patel was ineligible for CAT relief because he had failed to demonstrate that it was "more likely than not" that he would be tortured upon his return to India.

The arguments in Patel's petition for review consist mostly of conclusory statements that baldly assert his right to relief. With respect to his withholding claim, he argues generally that the evidence established that it was more likely than not that he would be persecuted on account of his religion were he to return to India. An alien qualifies for withholding of removal if he shows that it is more likely than not that he will face future persecution based on his race, religion, nationality, membership in a particular social group, or political opinion.  8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 1208.16(b)(2); see *Musollari v. Mukasey*, 545 F.3d 505, 508 n.2 (7th Cir. 2008).

Taking Patel at his word that he will either be exiled from the Hindu community if he testifies or attacked by the Muslim community if he refuses to do so, we understand that his religion has some bearing on his situation. As a Hindu who would be supporting Muslim claims of violence, such testimony might make him unpopular. Nevertheless, the BIA reasonably could conclude that the triggering event that he fears is the act of testifying. There is no evidence that Hindus in general are a disfavored group in Gujarat or, for that matter, anywhere else in India. This court has explicitly held that a desire not to testify as a material witness to a crime—even a witness to a political or religious crime—does not qualify as a protected basis for asylum or withholding of removal. See *Djouma v. Gonzales*, 429 F.3d 685, 688 (7th Cir. 2005); see also *Carmenatte-Lopez v. Mukasey*, 518 F.3d 540, 542 (8th Cir. 2008) (holding that "alleged status as a witness or informant, even with respect to a political crime, would not qualify [petitioner] for asylum or withholding of removal"). Specifically, this court reasoned in *Djouma*: "Being a material witness, even to a political crime (such as insurrection), is no more a status that the asylum law protects than being a criminal suspect is." 429 F.3d at 688. Were we to recognize apprehension like Patel's as grounds for withholding of removal, we would indirectly be hampering the legitimate efforts of the Gujarati government to prosecute the perpetrators of these kinds of incidents. We conclude, therefore, that while Patel's dilemma may be a sympathetic one, it is not sufficient to warrant relief from removal.

Patel also argues without elaboration that it is more likely than not that he will be tortured if he returns to India, and thus he is qualified for CAT protection. He correctly characterizes the legal standard for CAT: to be eligible for CAT relief an alien must prove that it is more likely than not that he will be tortured by, or at the acquiescence of, the government from which he seeks protection. 8 C.F.R. § 1208.18(a)(1); see also *Huang v.*

*Mukasey*, 525 F.3d 559, 564 n.4 (7th Cir. 2008). He has not presented one shred of evidence, however, that the Indian government will turn a blind eye to torture inflicted upon him as a result of his decision whether to testify. Because Patel presented no evidence connecting the threats of his attackers to the government, he failed to meet his burden under CAT.  See *Pavlyk v. Gonzales*, 469 F.3d 1082, 1090 (7th Cir. 2006).

Accordingly, we DENY Patel's petition for review.