******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., concurring in part and dissenting in part.[1] The interrogating police detectives lied to the defendant, Bobby Griffin, about evidence of his guilt, threatened to arrest his family members, falsely indicated that the crime of which he was accused exposed him to the death penalty, and falsely indicated that he would face a lesser charge if he confessed to the theory of the crime proposed to him by the interrogating officers. The majority acknowledges that these types of interrogation tactics can be coercive in some circumstances, and expresses disapproval of some of them, but ultimately concludes that each of these deceptive tactics was noncoercive in the present case. I respectfully disagree. The flaw in the majority's analysis is twofold. First, it gives insufficient weight to the coercive effect of certain tactics used by the police to extract a confession from the defendant. Second, it fails to acknowledge or to appreciate that these tactics were not discrete and unrelated but, rather, integrally coordinated parts of a well established and widely used interrogation method specifically designed to employ psychological manipulation as a means to overwhelm a suspect's will. Seeing the interrogation for what it was—which is to say, assessing the cumulative effect of the numerous coercive tactics employed in the present case in their totality—it is clear that the state did not meet its burden of proving that the defendant's confession was voluntary.

I reach this conclusion by application of settled legal principles in parts I and II of this opinion. At the end of part II, I address the majority's response to this analysis. Part III, although not necessary to the conclusion I reach in this particular case, goes on to discuss in greater detail the particular interrogation tactic of lying about inculpatory evidence and explains why we should adopt a less tolerant attitude toward this tactic in the future.

I

The United States Supreme Court recognized in its watershed decision, *Miranda* v. *Arizona*, 384 U.S. 436, 445, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), that "[a]n understanding of the nature and setting of this in-custody interrogation is essential to our decisions today." Although the issue presently before us is the voluntariness of a confession following a valid waiver of *Miranda* rights, it is similarly essential to understand how the specific tactics contested by the defendant fit into the well documented interrogation method typically used by law enforcement officers. I begin with a more complete picture of the method employed in the defendant's interrogation, which, as I later explain, reflects a particular application of broadly utilized interrogation techniques. Although there may not be univer-

sal consensus as to the propriety or wisdom of these techniques, there is no question that they are designed to work cumulatively to extract a confession from a suspect whom the interrogator believes is guilty.

A

The two police detectives interrogating the defendant initially allowed him to offer his own account of his whereabouts on the night in question, how the gun seized from his house came into his possession, and what he knew about the shooting. For the first couple of hours, the defendant disclaimed any participation in the crime. In response, the interrogators repeatedly asserted that they already had evidence that proved that the defendant was the shooter. The interrogators told the defendant, falsely, that two eyewitnesses had identified him from a photographic array as the shooter and as one of two men who were attempting to rob the victim, that fingerprints had been recovered from shell casings found at the scene that the police were "gonna match to [the defendant's] prints," and that one of his coconspirators had given a statement that incriminated the defendant. They emphasized the fact that the (non-existent) eyewitnesses were strangers to the defendant and asserted that, as such, their identification could not be impeached at trial on the basis of a motive to lie or bias.

Because of their purported certitude that the evidence firmly established the defendant's identity as the shooter, the interrogators conveyed the idea to the defendant that the sole purpose of the interrogation was to help him by providing him with an opportunity to explain *why* he had shot the victim. They characterized the victim as just an "asshole drug dealer" and "a mope," who "brought this on himself" by not handing over the drugs and by making a comment about getting his gun. They repeatedly suggested that the shooting was an accident or an act of justifiable self-defense. They told the defendant that, if that was the case, it would make a "[h]uge difference in charges, huge difference in sentencing."

The interrogating officers also informed the defendant that, if he instead exercised his right to remain silent or continued to deny his involvement, things would get "worse" for him.[2] If he did not admit his role in the accidental or justifiable shooting, he could or would spend sixty-five years in jail or the state would "fry [him] . . . put [him] in the chair." They repeatedly made their point in terms that succinctly emphasized the futility of resistance: if the defendant did not confess, he was "fucked."

The threats made by the interrogators were multifaceted. The defendant was told that, because he had not admitted culpability, his mother and sister probably would be arrested for possession of the rifle recovered

from the house. The officers hammered the point that the defendant was not facing a charge of "regular" murder, but felony murder because he and another person had robbed, or attempted to rob, the victim. The defendant was told—falsely, with no basis in fact or law— that "[t]he choice is yours," that it is "up to you" which crime he would be charged with because what he told them, and what the officers in turn reported to the judge, would determine whether he was charged with "felony murder or being in the wrong place at the wrong time murder," "[felony] murder, manslaughter."[3]

The defendant inquired how much prison time he would get for manslaughter but was not given an answer. Offered this "choice" in the face of the foregoing threats and fabricated evidence of guilt, the defendant ultimately adopted the narrative proposed by the officers and confessed to them that he accidentally had shot the victim during the course of an attempted robbery. The defendant, of course, was not charged with manslaughter; he was charged with felony murder, the very crime that his interrogators told him would be avoided by a confession. It was all a ruse.

### B

The interrogation tactics employed against the defendant reflect a particular application of a method, commonly known as the Reid method, that has been the subject of scholarly debate and judicial criticism for decades.[4] See, e.g., *Miranda* v. *Arizona*, supra, 384 U.S. 448–53; *Dassey* v. *Dittmann*, 877 F.3d 297, 320–21 (7th Cir. 2017) (Wood, C. J., dissenting), cert. denied, U.S.    , 138 S. Ct. 2677, 201 L. Ed 2d 1072 (2018); *Dassey* v. *Dittmann*, supra, 335–36 (Rovner, J., dissenting); A. Hirsch, Review, "Going to the Source: The 'New' Reid Method and False Confessions," 11 Ohio St. J. Crim. L. 803, 805–808 (2014); S. Kassin, "The Psychology of Confession Evidence," 52 Am. Psychologist 221, 222–24 (1997). The Reid Manual, the most widely used and influential interrogation training manual in the United States, sets forth tactics "for the interrogation of suspects whose guilt, in the *opinion* of the investigator, seems definite or reasonably certain."[5] (Emphasis in original.) F. Inbau et al., Criminal Interrogation and Confessions (4th Ed. 2004) p. 209 (Reid Manual); see also id., pp. 5–8 (distinguishing between "nonaccusatory" interview during which guilt or innocence is assessed and "accusatory" interrogation). The Reid Manual sets forth a nine step interrogation model.[6] See id., p. 215.

Professor Richard A. Leo, one of the foremost scholars on interrogation practices,[7] explains that "each step of th[is] interrogation process builds on and reinforces the previous one so as to systematically neutralize the suspect's resistance, render him passive and compliant, persuade him to agree to a minimizing scenario of how he could have committed the crime, and then transform his compliance into a full written statement. The [nine

step] method emphasizes that interrogation is a lengthy and repetitive process in which the interrogator establishes psychological control over the suspect and gradually elicits a confession by raising the suspect's anxiety levels while simultaneously lowering the perceived consequences of confessing." R. Leo, Police Interrogation and American Justice (2008) p. 113; accord G. Gudjonsson, The Psychology of Interrogations, Confessions and Testimony (1992) p. 62 ("[a]ccording to the [Reid] model, a suspect confesses (i.e., tells the truth) when the perceived consequences of a confession are more desirable than the anxiety generated by the deception (i.e., denial)"); see also *Dassey* v. *Dittmann*, supra, 877 F.3d 321 (Wood, C. J., dissenting).

Courts and commentators have categorized Reid's nine steps as falling into two overarching techniques, frequently referred to as maximization and minimization.[8] See, e.g., *United States* v. *Monroe*, 264 F. Supp. 3d 376, 391 (D.R.I. 2017); *In re Elias V.*, 237 Cal. App. 4th 568, 583, 188 Cal. Rptr. 3d 202 (2015), review denied, Docket No. S228370, 2015 Cal. LEXIS 9243 (Cal. September 23, 2015); *Commonwealth* v. *Cartright*, 478 Mass. 273, 289, 84 N.E.3d 851 (2017); S. Drizin & R. Leo, "The Problem of False Confessions in the Post-DNA World," 82 N.C. L. Rev. 891, 917 (2004); M. Gohara, "A Lie for a Lie: False Confessions and the Case for Reconsidering the Legality of Deceptive Interrogation Techniques," 33 Fordham Urb. L.J. 791, 821–22 (2006); see also A. Hirsch, supra, 11 Ohio St. J. Crim. L. 805 (categorizing steps as confrontation and minimization); R. Leo, supra, pp. 150–55 (categorizing steps as use of positive and negative incentives). The maximization technique is designed to convey "the interrogator's [rock solid] belief that the suspect is guilty and that all denials will fail. Such tactics include making an accusation, overriding objections, and citing evidence, real or manufactured, to shift the suspects' mental state from confident to hopeless." (Internal quotation marks omitted.) *In re Elias V.*, supra, 583; accord M. Kim, "When and Why Suspects Fail to Recognize the Adversary Role of an Interrogator in America: The Problem and Solution," 52 Gonz. L. Rev. 507, 511 (2016–2017). "[T]he interrogator aggressively confronts the suspect with the magnitude of his situation, hoping to convince him that he is in serious trouble and likely to be punished severely." M. Gohara, supra, 821–22. "The minimization technique is the opposite. It is designed to provide the suspect with moral justification and face-saving excuses for having committed the crime in question. This technique includes methods such as lulling suspects into a false sense of security by blaming the victim and downplaying the seriousness of the crime." (Footnote omitted; internal quotation marks omitted.) M. Kim, supra, 511–12; see also M. Gohara, supra, 821. This tactic "communicates by implication that leniency in punishment is forthcoming upon confession." (Internal quotation marks omitted.) *In re*

*Elias V.*, supra, 583.

"[I]nterrogators will . . . commonly [say] that the only way [that the suspect] can help himself is by providing the reasons he committed the crime. Usually, however, interrogators will first suggest possible reasons or scenarios to get him to admit to it. . . . Interrogators advance scenarios to persuade a suspect that if he admits to the act he can—with the interrogators' help—control how that act is framed to other audiences (e.g., prosecutors, judges, juries, his friends and family, the victim, the victim's friends and family, the media, and so on). In other words, he can explain his motive in a way that will portray him in the most sympathetic light and minimize his social, moral, and legal culpability." (Citation omitted.) R. Leo, supra, pp. 152–53.

"[T]he most significant and effective scenarios are those that offer the suspect legal excuses or justifications for his alleged behavior. These types of scenarios redefine the suspect's mens rea (i.e., mental state) and thus the formal elements of the crime such that the suspect's legal culpability is reduced or eliminated. For example, it is common in murder investigations for interrogators to suggest that the suspect killed the victim in self-defense. Because self-defense is not a crime, the scenario suggests that the suspect will not be charged or punished for admitting to it. It is also common in murder investigations for interrogators to suggest that the suspect killed the victim accidentally, again mitigating the criminality of the act and seemingly lowering the punishment if the suspect agrees to the accident scenario . . . . These scenarios are effective because they 'pragmatically' communicate that the suspect will receive a lower charge or lesser punishment if he agrees to the suggested scenario . . . ." (Citations omitted.) Id., pp. 153–54.

A particular application of one of these minimization or maximization tactics may be deemed so egregious as to be sufficient in and of itself to establish coercion.[9] See *State* v. *Baker*, 147 Haw. 413, 435, 465 P.3d 860 (2020) ("a single coercive interrogation technique may render a confession involuntary"). Because these tactics, however, are designed to work cumulatively and synergistically to overcome a presumptively guilty suspect's resistance to admit his culpability; see R. Leo, supra, p. 113; their impact cannot be dismissed when individual tactics do not rise to this level. The totality of the circumstances test demands consideration of the cumulative impact of these tactics. See *Dassey* v. *Dittmann*, supra, 877 F.3d 322 (Wood, C. J., dissenting) ("The majority finds some significance in the notion that the detectives' tactics were not per se coercive, but that is a red herring. [The] cases cannot be assessed based on one sentence, or one restroom break, or the comfort (or lack thereof) of one room. The [United States] Supreme Court has instructed that the voluntari-

ness inquiry requires a full consideration of the compounding influence of the police techniques as applied to this suspect." (Emphasis omitted; internal quotation marks omitted.)); *Wilson* v. *Lawrence County*, 260 F.3d 946, 953 (8th Cir. 2001) ("a totality of the circumstances analysis does not permit state officials to cherry-pick cases that address individual potentially coercive tactics, isolated one from the other, in order to insulate themselves when they have combined all of those tactics in an effort to overbear an accused's will"); *State* v. *Baker*, supra, 423 ("[c]rucially, a court must not analyze the individual circumstances in isolation, but must weigh those circumstances in their totality"); *State* v. *Grey*, 274 Mont. 206, 211, 907 P.2d 951 (1995) ("[s]everal factors can culminate in a totality of circumstances that render a confession involuntary").

The Hawaii Supreme Court's recent decision in *State* v. *Baker*, supra, 147 Haw. 413, is a good example of the proper approach.[10] That court identified seven separate, potentially coercive interrogation tactics that had been employed in that case, none of which was so individually coercive as to overcome the defendant's will.[11] See id., 433–35. The court recognized, however, as have other courts, that "[a]n interrogator's use of multiple coercive interrogation tactics in conjunction can exacerbate the coercive effect of the individual tactics. See [*Commonwealth* v.] *DiGiambattista*, [442 Mass. 423, 438–39, 813 N.E.2d 516 (2004)] (explaining that . . . coercive effect of . . . assertion about irrefutable evidence of guilt is worsened when it is combined with minimization tactics); [*State* v.] *Rettenberger*, 984 P.2d [1009, 1017 (Utah 1999)] ('The significance of the [false friend technique] comes in relation to other tactics and factors.')." *State* v. *Baker*, supra, 433. It ultimately concluded: "All of the tactics used [in *Baker*], except for the improper gender stereotyping, made an implied promise to [the defendant] that he would benefit if he confessed and suffer adverse consequences if he did not. The use of these tactics in conjunction with one another exacerbated their overall coercive effect on [the defendant] because they ultimately presented the same implicit promise of gaining a benefit by confessing—and receiving a detriment by not admitting guilt." Id.

## II

I next turn to the voluntariness of the defendant's confession in the present case. It is important to emphasize that not every minimization and maximization tactic is coercive. See, e.g., *Commonwealth* v. *Harris*, 468 Mass. 429, 436–37, 11 N.E.3d 95 (2014) (particular minimization tactics used were not coercive). Several tactics employed in the present case are unchallenged and are widely accepted as within the proper bounds of interrogation. The tactics that are challenged include engaging in false evidence ploys, threatening the defen-

dant's family with arrest, maximizing the consequences of not confessing, and suggesting that confessing would be met with leniency. The majority purports to apply the totality of the circumstances test, but its analysis suffers from two related flaws. When addressing each of the individual tactics, the majority unduly minimizes its potential effect on the defendant. Then, having concluded that none of these tactics is coercive per se, it reaches the seemingly logical conclusion that they could not have overcome the defendant's will under the totality of the circumstances. I first explain why I take a different view of the coercive nature of the individual tactics and conclude that their cumulative effect rendered the defendant's confession involuntary. Following that explanation, I respond to the majority's critique of this opinion.

I begin with the false evidence of guilt presented to the defendant, principally consisting of the supposed existence of independent eyewitness identifications of the defendant as the shooter and fingerprints on shell casings found at the scene. I agree with the majority that courts generally have not deemed such conduct, *in and of itself*, sufficient to render a confession involuntary.[12] Many courts have, however, recognized that such ploys are a factor that should be considered when determining whether a confession was coerced. See, e.g., *Frazier* v. *Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) ("[t]he fact that the police misrepresented the statements that [the defendant's companion] had made is, *while relevant*, insufficient in our view to make this otherwise voluntary confession inadmissible" (emphasis added)); *Mara* v. *Rilling*, 921 F.3d 48, 80 (2d Cir. 2019) (misrepresentations regarding existence of eyewitness are "relevant to voluntariness"); *Holland* v. *McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992) ("[t]he fact that the officer misrepresented to [the defendant] the strength of the evidence against him, while insufficient [by itself] to make [an] otherwise voluntary confession inadmissible, is one factor to consider among the totality of circumstances in determining voluntariness" (internal quotation marks omitted)), cert. denied, 506 U.S. 1082, 113 S. Ct. 1053, 122 L. Ed. 2d 360 (1993); *Green* v. *Scully*, 850 F.2d 894, 903 (2d Cir.) (noting that falsely informing defendant that his fingerprints matched prints in blood in victims' apartment "is the type of police tactic that makes the issue of voluntariness in this case such a close one" but concluding that defendant's statement revealed that he confessed for entirely different reason), cert. denied, 488 U.S. 945, 109 S. Ct. 374, 102 L. Ed. 2d 363 (1988); *State* v. *Swanigan*, 279 Kan. 18, 32, 106 P.3d 39 (2005) (lies that fingerprints were found at scene and matched to defendant "must be viewed as a circumstance in conjunction with others, e.g., additional police interrogation tactics"); *Commonwealth* v. *Libby*, 472 Mass. 37, 42, 32 N.E.3d 890 (2015) ("the use of false information

by [the] police during an interrogation is deceptive and is a relevant factor indicating a possibility that the defendant's statements were made involuntarily" (internal quotation marks omitted)); *Commonwealth* v. *DiGiambattista*, supra, 442 Mass. 433 ("our case law . . . suggests that where the use of a false statement is the *only* factor pointing in the direction of involuntariness, it will not ordinarily result in suppression, but that if the circumstances contain additional indicia suggesting involuntariness, suppression will be required" (emphasis in original)); *State* v. *Allies*, 186 Mont. 99, 113, 606 P.2d 1043 (1979) (lying to defendant about how much is known about his involvement in crimes was one of two variables weighing heavily in court's voluntariness analysis); *State* v. *Register*, 323 S.C. 471, 479, 476 S.E.2d 153 (1996) ("misrepresentations of evidence by police, although a relevant factor, do not render an otherwise voluntary confession inadmissible"), cert. denied, 519 U.S. 1129, 117 S. Ct. 988, 136 L. Ed. 2d 870 (1997).

The majority discounts the relevance of the false evidence ploys in the present case because most of the statements regarding false evidence were made in the first hour of the interrogation, when the defendant continued to deny his involvement and "pushed back" on these claims. Part II of the majority opinion. I find this temporal isolation to be a serious mistake because it ignores the fundamentally integrated nature of the interrogation tactics at issue and the cumulative and synergistic effect, over time, of the various tactics employed by the police. The entire point of the maximization and minimization techniques is that they work together over the course of the interrogation. See *State* v. *Baker*, supra, 147 Haw. 423, 433. It is significant, moreover, that the interrogators not only returned to the importance of the eyewitness identifications after the defendant's initial push back but also cast the false evidence as effectively unimpeachable—an assertion that could only be intended to convince the defendant that resistance would be futile. In addition, simply because the defendant asserted that his fingerprints were not on the shell casings does not mean that he was unconcerned by the lead interrogator's unequivocal statements that the (nonexistent) prints were "gonna" match the defendant's. These lies about the strength of the evidence against the defendant undoubtedly contributed to the pressure on him to "choose" to confess to manslaughter rather than to maintain his disavowal of responsibility and face felony murder charges.[13] The lies played an obvious and essential role in communicating the drumbeat theme of the Reid method, which is that resistance is futile and confession is the only rational choice.

With regard to the threat to arrest the defendant's mother and sister, the majority acknowledges that this threat "apparently was intended to exploit and play on the defendant's previously expressed concern" about his family's criminal exposure for the rifle. Part II A

of the majority opinion. The majority also refuses to "condone" this tactic and "acknowledge[s] that such tactics can provide a basis for concluding that a confession is involuntary." Id. I agree with each of these statements, although I would have expressed my disapproval of this tactic in far stronger terms. I disagree, however, with the majority's inexplicable decision to overlook the coercive effect of this conduct simply because it was the defendant who had initially raised this matter. The logic of this point escapes me. If anything, the defendant's admitted concern about his family's welfare makes the tactic more coercive because it demonstrates that he was susceptible to his interrogators' exploitation of that fear, and the interrogators used this psychological vulnerability improperly to increase the pressure on the defendant to confess. Given that the defendant had stated from the outset that he would take responsibility for possession of the rifle, and there was no evidence that anyone else in the home knew about the rifle; see *State* v. *Rhodes*, 335 Conn. 226, 234, 249 A.3d 683 (2020); his family members were not actually at risk of criminal exposure, and it was coercive for the interrogators to suggest that the defendant's failure to take responsibility for the shooting put them at such risk. See *People* v. *Dowdell*, 227 Cal. App. 4th 1388, 1401, 174 Cal. Rptr. 3d 547 (2014) ("[a] threat by [the] police to arrest or punish a close relative, or a promise to free the relative in exchange for a confession, may render an admission invalid" (internal quotation marks omitted)), review denied, Docket No. S220560, 2014 Cal. LEXIS 9829 (Cal. October 15, 2014), and review denied sub nom. *In re Lincoln*, Docket No. S220800, 2014 Cal. LEXIS 9837 (Cal. October 15, 2014).

With regard to the interrogators' statements maximizing the consequences of not confessing, I agree in part with the majority's treatment of this conduct. There was nothing improper about telling the defendant that he could or would face a sixty-five year term of imprisonment if he were convicted of felony murder, or even murder. This was an accurate statement of the law, consistent with the known facts of the crimes. See *State* v. *Evans*, 146 N.M. 319, 328, 210 P.3d 216 (2009) ("[T]hreats that merely highlight potential real consequences, or are adjurations to tell the truth, are not characterized as impermissibly coercive. . . . It is not per se coercive for [the] police to truthfully inform an accused about the potential consequences of his alleged actions." (Citation omitted; internal quotation marks omitted.)). I disagree with the majority, however, that the lead interrogator's reference to the death penalty should not be given meaningful weight in the totality of the circumstances analysis. The threat was emphatically not an accurate statement of the law, but a rank falsehood; the defendant could not have been exposed to a potential death sentence. See *People* v. *Holloway*, 33 Cal. 4th 96, 115–17, 91 P.3d 164, 14 Cal. Rptr. 3d 212

(2004) (contrasting cases in which officers properly and accurately represented that death penalty was available from cases in which officers improperly made false representations regarding death penalty), cert. denied, 543 U.S. 1156, 125 S. Ct. 1302, 161 L. Ed. 2d 122 (2005). Irrespective of the facts that it was "a single, isolated statement" and that the other interrogator immediately thereafter changed the subject; part II A of the majority opinion; it defies common sense to conclude that the possibility of a death sentence was shrugged off or forgotten by the defendant. Cf. *Green* v. *Scully*, supra, 850 F.2d 903 (deeming it significant that improper "scare tactic" of referring to electric chair was not further employed and that petitioner was told several times that "this case was 'not about the chair' ").

The interrogator's statement about the death penalty was not the only misrepresentation of law made to the defendant. The interrogators repeatedly indicated to the defendant that, without a confession, he would face a felony murder charge, but suggested that, if he admitted that the shooting was accidental or in self-defense, he would face far lesser charges, in particular, manslaughter. Again, none of this is true. Neither accident nor self-defense is relevant when the elements of felony murder are established. See, e.g., *State* v. *Montgomery*, 254 Conn. 694, 734, 759 A.2d 995 (2000); *State* v. *Amado*, 254 Conn. 184, 201–202, 756 A.2d 274 (2000); *State* v. *Lewis*, 245 Conn. 779, 812, 717 A.2d 1140 (1998). The "choice" that the interrogators offered to the defendant between being charged with felony murder (if he refused to admit culpability) or with manslaughter (if he confessed) was completely fabricated and terribly misleading.[14] "Unlike misrepresentations of fact, which generally are not enough to render a suspect's ensuing confession involuntary, [p]olice misrepresentations of law . . . are much more likely to render a suspect's confession involuntary." (Internal quotation marks omitted.) *Johnson* v. *State*, 268 So. 3d 806, 810 (Fla. App. 2019); see also *United States* v. *Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010); *People* v. *Cahill*, 22 Cal. App. 4th 296, 315, 28 Cal. Rptr. 2d 1 (1994), review denied, California Supreme Court, Docket No. S020126 (June 2, 1994); *State* v. *Valero*, 153 Idaho 910, 913, 285 P.3d 1014 (App. 2012); *Commonwealth* v. *Baye*, 462 Mass. 246, 257, 967 N.E.2d 1120 (2012). "Although we do not require a law enforcement officer to inform a suspect of the penalties for all the charges he may face, if he misrepresents these penalties, then that deception affects our evaluation of the voluntariness of any resulting statements." *United States* v. *Young*, 964 F.3d 938, 944 (10th Cir. 2020).

The majority recognizes that the interrogators made many statements suggesting that the defendant would receive leniency in exchange for confessing. It dismisses the coercive effect of these statements because the interrogators did not "definitively" promise

leniency, and case law recognizes that it is not coercive to tell a defendant that cooperation would be to his benefit. Part II A of the majority opinion. The first reason, although supported by some authority, ignores reality by failing to acknowledge that an officer's implied promise of leniency may be just as meaningful to a lay defendant as a "definitive" promise of leniency. See S. Drizin & R. Leo, supra, 82 N.C. L. Rev. 917 n.138 (citing psychology research addressing " '[p]ragmatic [i]mplication,' " which "refers to the sending and processing of implicit meanings in communication, as occurs when an individual 'reads between the lines' or when information or meaning is inferred from what a speaker is saying or suggesting"). Many courts have recognized that an implied promise of leniency can convey the same message as an express one.[15] See, e.g., *United States* v. *Craft*, 495 F.3d 259, 263–64 (6th Cir.), cert. denied, 552 U.S. 1052, 128 S. Ct. 679, 169 L. Ed. 2d 532 (2007); *People* v. *Cahill*, supra, 22 Cal. App. 4th 311–15; *Martin* v. *State*, 107 So. 3d 281, 314 (Fla. 2012), cert. denied, 570 U.S. 908, 133 S. Ct. 2832, 186 L. Ed. 2d 890 (2013); *State* v. *Baker*, supra, 147 Haw. 433; *State* v. *Smith*, 162 Idaho 878, 885, 406 P.3d 890 (App. 2017), review denied, Idaho Supreme Court, Docket No. 44499-2016 (December 21, 2017); *McGhee* v. *State*, 899 N.E.2d 35, 38 (Ind. App. 2008), transfer denied, 915 N.E.2d 995 (Ind. 2009); *State* v. *Nicklasson*, 967 S.W.2d 596, 606 (Mo.), cert. denied, 525 U.S. 1021, 119 S. Ct. 549, 142 L. Ed. 2d 457 (1998); *State* v. *Old-Horn*, 375 Mont. 310, 317, 328 P.3d 638 (2014); *State* v. *L.H.*, 239 N.J. 22, 43–46, 215 A.3d 516 (2019). As the Massachusetts Supreme Judicial Court noted: "We have long recognized that false promises . . . as might excite hopes in the mind of the prisoner, that he should be materially benefitted by making disclosures can undermine a defendant's ability to make an autonomous decision to confess, and are therefore properly regarded as coercive. . . . Such promises may be either expressed or implied."[16] (Citation omitted; internal quotation marks omitted.) *Commonwealth* v. *Baye*, supra, 462 Mass. 257–58; see also *Commonwealth* v. *DiGiambattista*, supra, 442 Mass. 435–36 ("[c]oercion may be readily applied by way of implied threats and promises, just as it is by express threats and promises"); cf. *State* v. *Phelps*, 215 Mont. 217, 224, 696 P.2d 447 (1985) (although confession must not be "obtained by any direct or implied promises, however, slight," alleged promise that is "couched in terms of a mere possibility or an opinion . . . does not constitute a sufficient promise to render a confession involuntary" (internal quotation marks omitted)). The question is not whether the officers spoke in definitive or formally binding contractual terms, but whether a reasonable person in the defendant's position would have interpreted their statements as a promise of leniency. See *Grades* v. *Boles*, 398 F.2d 409, 412 (4th Cir. 1968) ("[t]he perspective from which the statements must be viewed is that of the defendant"); *People*

v. *Conte*, 421 Mich. 704, 739–40, 365 N.W.2d 648 (1984) ("[I]t is from [the] defendant's perspective that we will view the alleged promises. . . . The inquiry will be whether the defendant is likely to have reasonably understood the statements in question to be promises of leniency." (Citations omitted.)).

The second reason cited by the majority to condone the interrogators' false "suggestions" of leniency is that it is permissible to tell a suspect that it would benefit him to cooperate. Part II A of the majority opinion. This is a correct and uncontroversial statement of the law, but the point has no application to the contested statements in the present case. It is true enough that the interrogators properly could tell the defendant that, if he took responsibility—whether claiming accident, self-defense, or simply an intentional but regrettable act— he could likely help himself.[17] They properly could tell him that, by doing so, he *could* face lesser punishment. These would not be false statements. An early admission of responsibility could reduce the sentence ultimately imposed. It is an entirely different matter, however, to falsely convey to the defendant that it was his "choice" and "up to him" as to whether he was charged with felony murder or a far less serious crime (i.e., a "huge difference in charges").[18] See *United States ex rel. Everett* v. *Murphy*, 329 F.2d 68, 70 (2d Cir.) ("[a] confession induced by [the] police falsely promising assistance on a charge far less serious than the police knew would actually be brought is not to be considered a voluntary confession"), cert. denied, 377 U.S. 967, 84 S. Ct. 1648, 12 L. Ed. 2d 737 (1964); *State* v. *McCoy*, 692 N.W.2d 6, 28 (Iowa 2005) (officer can tell suspect that it is better to tell truth, but, if officer tells suspect what advantage is to be gained or is likely from making confession, officer's statement becomes promise of leniency rendering statement involuntary). This was an implicit promise that the interrogators could not keep, not only because they lacked the authority to make good on any such promise but, more importantly, because the promise had no realistic basis in the law. As such, the promise of leniency in the present case is a highly relevant factor in assessing the voluntariness of the confession. See P. Marcus, "It's Not Just About *Miranda*: Determining the Voluntariness of Confessions in Criminal Prosecutions," 40 Val. U. L. Rev. 601, 621–22 and n.124, 622 n.129 (2006) (citing case law demonstrating that promise of leniency does not, by itself, require suppression of confession but is relevant factor in totality of circumstances analysis, except when promise lacks causal connection to decision to confess or promise is kept).

The timing of this particular aspect of the interrogation also warrants consideration because the defendant agreed to give a confession immediately after being presented with this legally baseless "choice." Under the majority's view that temporal proximity to the confes-

sion is key in assessing the coercive effect of an interrogation tactic, this tactic should be deemed particularly significant given that the defendant's confession immediately followed his interrogator's implied promise that the defendant's confession could result in only a manslaughter charge. Although the synergistic and cumulative nature of the interrogation method at issue compels me to disagree with the majority's view regarding the importance of temporal proximity generally, this particular aspect of the interrogation plainly was the tipping point for the defendant, and the false information conveyed to the defendant in this respect should also be given significant weight in assessing whether his confession was coerced.

Finally, it is important to consider that the promises of leniency if the defendant confessed were juxtaposed against threats that the judge would be told that the defendant was not cooperating, which would be "worse" for the defendant. The Kansas Supreme Court had this to say about such a tactic: "This court has held that, without more, a law enforcement officer's offer to convey a suspect's cooperation to the prosecutor is insufficient to make a confession involuntary. . . . Kansas appellate courts, however, have not addressed the other side of the same coin . . . i.e., law enforcement conveying a suspect's *lack* of cooperation to the prosecutor. A growing number of courts have disapproved [of] this tactic. Those not finding that it is coercive per se regard it as another circumstance to be considered in determining the voluntariness of the confession." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Swanigan*, supra, 279 Kan. 33–34; see also *State* v. *Rettenberger*, supra, 984 P.2d 1018 ("[p]romises of leniency necessarily imply the threat of harsher punishment").[19]

The interrogators' use of multiple, coercive interrogation tactics plainly exacerbated the coercive effect of each individual tactic. It took close to four hours for the collective effect of these tactics to overbear the defendant's will to resist the interrogators' pressure to confess to accidentally shooting the victim. The fact that the defendant failed to present evidence that he had any specific characteristics that rendered him particularly susceptible to coercion[20] does not negate the coercive effect of this multidimensional strategy.[21] "[P]olice induce most false confessions from mentally normal adults . . . ." R. Leo, supra, p. 234. The defendant's prior experience with the criminal justice system is a factor that cuts both ways. Although such experience may further bolster the defendant's understanding of his *Miranda* rights, a study has demonstrated that suspects with prior felony convictions are more vulnerable than others to false evidence ploys. See R. Leo, "Inside the Interrogation Room," 86 J. Crim. L. & Criminology 266, 295 (1996). "While [personal characteristics] are pertinent considerations when assessing

whether, in the totality of the circumstances, the defendant's will was overborne . . . their significance is context dependent and diminishes with the severity of the police misconduct at issue . . . ." (Citation omitted.) *Commonwealth* v. *Baye*, supra, 462 Mass. 262; see also *United States* v. *Young*, supra, 964 F.3d 946 ("[the defendant's] personal characteristics are not dispositive, and they do not convince us that [the defendant] could withstand the coercion created by [the federal agent's] legal misrepresentations and promises of leniency"); *Green* v. *Scully*, supra, 850 F.2d 902 (officer's conduct is "[the] most critical circumstance").

Given the nature, variety, and pervasiveness of the coercive tactics employed in the present case, I would conclude that, under the totality of the circumstances, "the conduct of [the] law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . ." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 321, 96 A.3d 1199 (2014). "The use of these tactics in conjunction with one another exacerbated their overall coercive effect . . . ." *State* v. *Baker*, supra, 147 Haw. 433. The majority's conclusion to the contrary is not, in my view, a fair assessment of the *totality* of the circumstances.

Before I turn to the question of whether the improper admission of the defendant's confession requires a new trial, it is necessary to respond to several unfounded criticisms leveled by the majority. The majority contends that I have improperly discounted the trial court's finding that the defendant remained " 'calm and low-key' " by failing to give that finding due weight in assessing whether the defendant's confession was voluntary, as the majority does; part II A of the majority opinion; and by instead acknowledging the possibility, supported by social science research, that psychological, emotional, and cultural factors may cause a person to adopt a mask of calm fearlessness. See footnote 21 of this opinion; cf. *State* v. *Purcell*, 331 Conn. 318, 356–57, 203 A.3d 542 (2019) (drawing on sociolinguistic research not presented at trial to support analysis). I disagree with several of the underpinnings of this argument.[22] First, the issue is not *whether* the defendant appeared to be "calm and low-key" during his interrogation; indeed, contrary to the majority's suggestion, I fully accept this finding. The real question is *what to make of that demeanor*. In my view, the well-known phenomenon of masking and the social science research on that subject—not to mention the interrogating officer's own assessment that the defendant was putting on a "tough guy" facade while being questioned—cast doubt on the trial court's uncritical assumption that the defendant's outward demeanor reflected an inner state of unpressured calmness. Second, the fact that the defendant adopted a different demeanor at one point during the interrogation, pre-

tending to be fearful of Quan Bezzle, supports rather than undermines the possibility that the defendant was engaged in masking. If we believe that the defendant was concealing his true emotions by pretending to be afraid of Bezzle, we must also take seriously the possibility that he was concealing his true emotions by pretending to be calm. The majority does not explain why it chooses to discern one instance of deceptive demeanor but dismiss out of hand the realistic possibility of a second instance of deceptive demeanor by the same person during the same interrogation. Third, the majority draws on a well settled but inapt principle, namely, that a fact finder may rely on demeanor, *as one of many factors*, to assess a witness' *credibility*.[23] Because the trial court's determination of voluntariness is not a finding of fact to which we must defer, it is proper to take into account the research regarding masking and record evidence consistent with that research. See *State* v. *Christopher S.*, 338 Conn. 255, 274–75, 257 A.3d 912 (2021) ("[T]he trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . [A]lthough we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of voluntariness. . . . [W]e review the voluntariness of a confession independently, based on our own scrupulous examination of the record. . . . Accordingly, we conduct a plenary review of the record in order to make an independent determination of voluntariness." (Internal quotation marks omitted.)) The majority further criticizes this opinion for failing to focus on the defendant's personal characteristics such as his age, educational status, and intellectual functioning. The majority is correct that the defendant was over the age of majority and exhibited no obvious intellectual impairments. See footnote 20 of this opinion. The point of this opinion, however, is that the coercive tactics used by police interrogators are designed to overbear the will of a suspect even without impaired intellect or extreme youth. The statistics cited herein demonstrate this very point.

The majority also seriously misapprehends my point about the interrogators' misrepresentation about the defendant's "choice." The majority states that I interpret "the officers [to be] telling the defendant that he could decide which charges to levy against himself . . . ." Footnote 24 of the majority opinion. I am saying nothing of the kind. My focus is on the following statement made immediately before the defendant's confession: "*The choice is yours. Murder, manslaughter. That's your choice.* That's what you're looking at. Right now, you're looking at murder, *felony murder*. Just cuz you're being a knucklehead and not coming to grips that you're fucked if you continue to stick with this

story. We have too much against you." (Emphasis added.) In making this statement, the interrogators plainly were not suggesting that the defendant would be drafting the charging instrument or participating in the decision whether to charge himself with manslaughter or murder. The misrepresentation by the officers consisted of telling the defendant that, if he confessed to shooting the victim by accident—a narrative that the interrogators earlier had cast as wholly believable under the known circumstances—his "choice" to confess to that scenario would influence the charging decision and result in a reduction of the charge from felony murder to manslaughter, i.e., it would make a "[h]uge difference in [the] charges . . . ." See R. Leo, Police Interrogation and American Justice, supra, pp. 153–54 (minimization tactic used by police falsely suggests to "a suspect that if he admits to the act he can—with the interrogators' help—*control how that act is framed to other audiences* (*e.g.*, *prosecutors*, *judges*, *juries* . . .)" and, in doing so, can "*minimize his . . . legal culpability*," and scenarios suggesting accident or self-defense " 'pragmatically' communicate that the suspect will receive a lower charge or lesser punishment if he agrees to the suggested scenario" (emphasis added)). The interrogating officer made a gross misrepresentation of applicable law because there was no basis whatsoever to tell the defendant that confessing to the proposed narrative would (or probably would, or even realistically might) result in a manslaughter charge rather than "murder, felony murder" charges.[24] See footnote 18 of this opinion. Although the majority attempts to diminish the effect of the legal misstatement by positing that the prosecutor could "consider [accident or self-defense] when choosing whether to charge the defendant with felony murder," I consider that interpretation to be objectively unreasonable because it simply cannot be derived from what the officer actually said to the defendant. Footnote 24 of the majority opinion. The officer's words explicitly and unambiguously placed the "choice" in the defendant's hands and mentioned nothing whatsoever about prosecutorial discretion. The majority's misreading of this point allows it to knock down a strawman rather than address what this opinion actually says.

Ultimately, the majority's view glosses over the paramount fact that the *state* bears the burden of proving that the defendant's confession was voluntary; see *Lego* v. *Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); which includes the burden of proving that the coercive interrogation tactics employed were not a motivating factor in the defendant's decision to confess. Cf. *Colorado* v. *Connelly*, 479 U.S. 157, 168, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (government bears burden of proof on threshold issue of whether valid waiver of *Miranda* rights occurred); *United States* v. *Matlock*, 415 U.S. 164, 178 n.14, 94 S. Ct. 988, 39

L.Ed.2d 242 (1974) (preponderance of evidence standard is controlling burden of proof for suppression hearings). I would conclude that the state has not proved that it is more likely than not that, in the absence of the cumulative effective of the coercive tactics employed— lying about inculpatory evidence, threatening to arrest the defendant's family members, falsely indicating that the defendant could face the death penalty, and making false promises of leniency—the defendant still would have confessed.

I would also conclude that the state failed to meet its burden of proving that the improper admission of the defendant's confession was harmless beyond a reasonable doubt. See, e.g., *State* v. *Hafford*, 252 Conn. 274, 297, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000). "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." (Internal quotation marks omitted.) *Zappulla* v. *New York*, 391 F.3d 462, 473 (2d Cir. 2004), cert. denied, 546 U.S. 957, 126 S. Ct. 472, 163 L. Ed. 2d 358 (2005), quoting *Arizona* v. *Fulminante*, 499 U.S. 279, 296, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991); see also *Arizona* v. *Fulminante*, supra, 313 (Kennedy, J., concurring in the judgment) ("the court conducting a [harmless error] inquiry must appreciate the indelible impact a full confession may have on the trier of fact"). "[A]n error in admitting the confession should not ordinarily be deemed harmless absent a strong showing by the state that [the defendant's] guilt would have been assured based solely on the other evidence presented at trial." (Emphasis omitted; internal quotation marks omitted.) *Zappulla* v. *New York*, supra, 473–74.

Only "when there is independent overwhelming evidence of guilt" can the state meet its burden of proving that the constitutional error was harmless beyond a reasonable doubt. (Internal quotation marks omitted.) *State* v. *Hafford*, supra, 252 Conn. 297. It cannot meet that burden on this record. There were no eyewitnesses or forensic evidence proving that the defendant was at the scene. But cf. id., 298 (admission of confession was harmless when defendant was seen fleeing crime scene and, when approached by police, volunteered " 'I did it' numerous times," defendant's blood and footprints were found at crime scene, victim's blood was on defendant's clothes and on knife discovered in his car, and defendant's pubic hair was discovered near victim's naked body). No fruits of the robbery were found in the defendant's possession. The state's principal wit-

ness and the defendant's purported coconspirator, Nathan Johnson, testified pursuant to a cooperation agreement. The defendant's ambiguous comment about the shooting to the confidential police informant and the presence of the rifle in the defendant's home helped bolster Johnson's testimony, but this evidence was not direct proof of the defendant's actual participation in the crime itself. I would therefore reverse the defendant's conviction, except for the charge of criminal possession of a firearm, and remand for a new trial.

### III

In part II of this opinion, I explained why, under the current legal standard and case law, the majority has incorrectly concluded that the defendant's confession was not involuntary under the federal constitution. In this section, I set forth justifications for reconsidering the treatment historically given to the use of the false evidence ploy in the interrogation process and provide support for an approach under which that ploy is given greater weight in assessing the coerciveness of an interrogation under the totality of the circumstances test than it is currently given.[25]

The view that a false evidence ploy during an interrogation rarely is coercive and has a minimally coercive effect, even when combined with other interrogation tactics, comes from a case that was decided more than one-half century ago. See *Frazier* v. *Cupp*, supra, 394 U.S. 737–39 (1969 case holding that confession was voluntary even though officer falsely told suspect that his admitted companion on night of crime had confessed to crime).[26] Courts and commentators have begun to recognize that this view is premised on an anachronistic understanding of coercion, formed before the prevalence of false confessions was known. See, e.g., *Dassey* v. *Dittmann*, supra, 877 F.3d 332 (Rovner, J., dissenting) ("[*Frazier* and its progeny] were born in an era when the human intuition that told us that 'innocent people do not confess to crimes' was still largely unchecked. . . . We know, however, that this statement is unequivocally incorrect. Innocent people do in fact confess, and they do so with shocking regularity. . . . In a world where we believed that 'innocent people do not confess to crimes they did not commit,' we were willing to tolerate a significant amount of deception by the police. . . . And so our case law developed in a factual framework in which we presumed that the trickery and deceit used by police officers would have little effect on the innocent." (Citation omitted; footnotes omitted.)); id., 336 (Rovner, J., dissenting) ("[w]hat has changed is not the law, but our understanding of the facts that illuminate what constitutes coercion under the law"); *State* v. *Baker*, supra, 147 Haw. 431 ("in light of the various studies and cases that have emerged . . . we recognize that false claims of physical evidence result in an unsettling number of

false or involuntary confessions"); *Commonwealth* v. *DiGiambattista*, supra, 442 Mass. 434 ("[w]hile we adhere to the view that false statements about the evidence against the suspect do not automatically render the suspect's confession involuntary, we note that ongoing research has identified such use of false statements as a significant factor that pressures suspects into waiving their rights and making a confession"); M. Gohara, supra, 33 Fordham Urb. L.J. 794 ("The bedrock cases sanctioning police deception . . . [predate] the advent of DNA testing and the many exonerations that followed from DNA test results. . . . Examination of actual wrongful convictions and additional empirical data demonstrating the correlation between deceptive interrogation practices and false confessions provide a basis for reconsidering the line of cases that allow[s] [the] police to use trickery to obtain confessions. Such reconsideration is particularly critical because at the time those cases were decided, it was assumed that deceptive interrogations would not lead to false confessions." (Footnote omitted.)); see also *Corley* v. *United States*, 556 U.S. 303, 320–21, 129 S. Ct. 1558, 173 L. Ed. 2d 443 (2009) ("[c]ustodial police interrogation, by its very nature, isolates and pressures the individual . . . and there is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed" (citation omitted; internal quotation marks omitted)); *State* v. *Purcell*, supra, 331 Conn. 361 (noting that, although United States Supreme Court recognized in *Miranda* possibility of coercive custodial interrogation resulting in false confessions, magnitude of this problem was not known until recently).

There is mounting proof that lying to suspects about evidence against them contributes to false confessions. "False confessions are one of the leading causes of wrongful conviction of the innocent, second only to eyewitness misidentification."[27] M. Godsey, "Shining the Bright Light on Police Interrogation in America," 6 Ohio St. J. Crim. L. 711, 723 (2009); see also S. Kassin et al., "Police-Induced Confessions: Risk Factors and Recommendations," 34 Law & Hum. Behav. 3, 3 (2010) ("research suggests that false confessions and admissions are present in 15–20 [percent] of all DNA exonerations," which does not include false confessions disproved before trial, many that result in guilty pleas, those in which DNA evidence is not available, etc.). There is near universal consensus that the known false confessions represent a tip of the iceberg. See S. Drizin & R. Leo, supra, 82 N.C. L. Rev. 921; M. Godsey, supra, 724–25; A. Hirsch, supra, 11 Ohio St. J. Crim. L. 813; S. Kassin et al., supra, 3.

"From a convergence of three sources, there is strong support for the proposition that outright lies can put innocents at risk to confess by leading them to feel trapped by the inevitability of evidence against them.

These three sources are: (1) the aggregation of actual false confession cases, many of which involved use of the false evidence ploy;[28] (2) one hundred-plus years of basic psychology research, which proves without equivocation that misinformation can substantially alter people's visual perceptions, beliefs, motivations, emotions, attitudes, memories, self-assessments, and even certain physiological outcomes, as seen in studies of the placebo effect; and (3) numerous experiments, from different laboratories, demonstrating that presentations of false evidence increase the rate at which innocent research participants agree to confess to prohibited acts they did not commit."[29] (Footnote added.) S. Kassin et al., supra, 34 Law & Hum. Behav. 28–29. See generally M. Gohara, supra, 33 Fordham Urb. L.J. 827–31 (providing overview of "[e]mpirical [s]tudies [e]stablishing [t]hat [c]onfronting [s]uspects [w]ith [f]alse [e]vidence [a]nd [o]ther [d]eceptive [i]nterrogation [p]ractices [i]nduces [s]uspects to [c]onfess [f]alsely"); A. Hirsch, supra, 11 Ohio St. J. Crim. L. 805–806 and n.18 (addressing alt key experiment). The Reid Manual itself concedes that, although lying to a suspect about inculpatory evidence in and of itself would not cause a false confession, "it becomes much more plausible that an innocent person may decide to confess" if "such false statements were . . . used to convince the suspect that regardless of his stated innocence, he would be found guilty of the crime and . . . sentenced to prison" but would be afforded leniency "if he cooperates by confessing . . . ." F. Inbau et al., supra, p. 428.

"Psychologists have teased out two causal mechanisms by which the false evidence ploy may give rise to false confessions. . . . First, suspects may falsely confess as an act of compliance when they perceive that there is strong evidence against them.[30] Second, innocent suspects confronted with evidence that law enforcement claims to prove their guilt as an incontrovertible fact may falsely confess because they have come to internalize the belief that [they] committed the crime without awareness.

"The key factor underlying each of these psychological processes is the defendant's perception that his or her likelihood of conviction at trial is high . . . . The false evidence ploy enables interrogators to artificially inflate an innocent suspect's estimated likelihood of conviction and thereby make a plea bargain appear rational."[31] (Footnote altered; footnotes omitted; internal quotation marks omitted.) K. Wynbrandt, Comment, "From False Evidence Ploy to False Guilty Plea: An Unjustified Path to Securing Convictions," 126 Yale L.J. 545, 552–53 (2016).

This tactic may be especially effective with those segments of society that are more likely to believe that they, or others in their community, have been treated unfairly by the police and the legal system. See K.

Momolu, Gallup, Black Adults More Likely To Know People Mistreated by Police, (August 3, 2020), available at https://news.gallup.com/poll/316526/black-adults-likely-know-people-mistreated-police.aspx (last visited July 19, 2021) (reporting results of 2020 survey reflecting that 71 percent of "[b]lack Americans . . . [report] know[ing] 'some' or 'a lot of' people who were treated unfairly by the police . . . twice the [response] rate among [w]hite Americans," and that 50 percent of black adults, and 61 percent of black Americans between ages eighteen and forty-four "report knowing 'some' or 'a lot of' people who were unfairly sent to jail"); I. Capers, "Crime, Legitimacy, and Testilying," 83 Ind. L.J. 835, 836 (2008) ("[f]or many people of color and members of other politically vulnerable groups, [it] . . . comes as [no] surprise" that police officers misrepresent facts to justify traffic stops); D. Young, "Unnecessary Evil: Police Lying in Interrogations," 28 Conn. L. Rev. 425, 468 (1996) ("Those people who protest their innocence in the face of police lies about overwhelming evidence . . . may genuinely fear that they are being framed with fabricated evidence. While a more sophisticated, educated, and financially secure individual may be confident that he or his lawyer ultimately will be heard and the accusations withdrawn, those not so well situated may fear punishment for wrongs they did not commit. In particular, members of social groups with disproportionately high conviction rates, such as young black men, may despair of release and conclude they must confess to something to escape a worse fate.").

Recognition of the causal connection between deceptive interrogation tactics and false confessions has been a significant factor in a recent shift away from the use of the Reid method, which sanctions lying. One of the nation's largest police consulting firms has repudiated the Reid method; see Wicklander-Zulawski & Associates, Inc., Identify the Truth, available at https://www.w-z.com/truth/ (last visited July 19, 2021) ("[t]he high risk of false confessions, potential for incorrect or unreliable information, and ultimately the misapplication of confrontational techniques are all reasons why [Wicklander-Zulawski & Associates, Inc.] has chosen to no longer offer the confrontational approach in its course selections"); as have some foreign countries. See W. Kozinski, "The Reid Interrogation Technique and False Confessions: A Time for Change," 16 Seattle J. Soc. Just. 301, 304 n.16, 333–34 (2017) (noting England's shift from Reid method after concluding that its overly manipulative and coercive tactics caused false confessions and subsequent adoption of England's alternative, nonconfrontational method by United Kingdom, Norway and New Zealand).

The connection between police deception in interrogation and false confessions has also prompted recent legislative action. A bill proposed in New York State, which notes this connection in its statement of purpose,

would deem a confession or admission "involuntarily made" when it is obtained from a defendant "by knowingly communicating false facts about evidence to the defendant . . . ."[32] Senate Bill No. S324, § 1, 2021–2022 Leg., Reg. Sess. (N.Y. 2021).

This evidence has led to a call to recognize the coercive effect of lies and deception and give these considerations due weight when assessing whether a confession was voluntary under the totality of the circumstances. See *Dassey* v. *Dittmann*, supra, 877 F.3d 331 (Rovner, J., dissenting) ("[R]eform of our understanding of coercion is long overdue. When conducting a totality of the circumstances review, most courts' evaluations of coercion still are based largely on outdated ideas about human psychology and rational [decision making]. It is time to bring our understanding of coercion into the twenty-first century.");[33] *State* v. *Allies*, supra, 186 Mont. 113 ("[L]ying to [the] defendant about how much is known about his involvement in the crimes . . . is particularly repulsive to and totally incompatible with the concepts of due process embedded in the federal and [Montana] constitutions. The effect is particularly coercive . . . .").

False confessions are not the only reason for concern. From another vantage point, it should be immaterial whether there is a basis to believe that the defendant's confession in a given case was false. To the extent that the foregoing evidence demonstrates the realistic potential for coercion associated with lying as an interrogation tactic, the United States Supreme Court has reminded us that the rules that we adopt to prevent the admission of involuntary confessions apply even when it is clear that the defendant confessed to the truth: "[C]onvictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the [s]tate must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth. . . . To be sure, confessions cruelly extorted may be and have been, to an unascertained extent, found to be untrustworthy. But the constitutional principle of excluding confessions that are not voluntary does not rest on this consideration. Indeed, in many of the cases in which the command of the [d]ue [p]rocess [c]lause has compelled us to reverse state convictions involving the use of confessions obtained by impermissible methods, independent corroborating evidence left little doubt of the truth of what the defendant had confessed. Despite such verification, confessions were found to be the product of constitutionally impermissi-

ble methods in their inducement. Since a defendant had been subjected to pressures to which, under our accusatorial system, an accused should not be subjected, we were constrained to find that the procedures leading to his conviction had failed to afford him that due process of law which the [f]ourteenth [a]mendment guarantees." (Citations omitted.) *Rogers* v. *Richmond*, 365 U.S. 534, 540–41, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961); see also *Spano* v. *New York*, 360 U.S. 315, 320–21, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959) ("The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.").

These broader concerns about the integrity of the means by which we obtain confessions recognize that the tactics employed by law enforcement have ramifications beyond the present case. Many courts have expressed disapproval of the use of deception as an interrogation tactic; see, e.g., *Ex parte Hill*, 557 So. 2d 838, 842 (Ala. 1989); *State* v. *Cayward*, 552 So. 2d 971, 973 (Fla. App. 1989), review dismissed, 562 So. 2d 347 (Fla. 1990); *State* v. *Old-Horn,* supra, 375 Mont. 318; *People* v. *Robinson*, 31 App. Div. 2d 724, 725, 297 N.Y.S.2d 82 (1968); *State* v. *Jackson*, 308 N.C. 549, 573, 304 S.E.2d 134 (1983); *State* v. *Galli*, 967 P.2d 930, 936 (Utah 1998); sometimes quite vehemently. See, e.g., *United States* v. *Orso*, 266 F.3d 1030, 1039 (9th Cir. 2001) ("reprehensible"), cert. denied, 537 U.S. 828, 123 S. Ct. 125, 154 L. Ed. 2d 42 (2002); *Ex parte Hill*, supra, 842 ("especially repugnant when used against suspects of diminished intellectual ability"); *State* v. *Phelps*, supra, 215 Mont. 225 ("[w]e cannot overemphasize our strong condemnation" (internal quotation marks omitted)); *State* v. *Register*, supra, 323 S.C. 480 ("a deplorable practice"); *State* v. *Von Dohlen*, 322 S.C. 234, 243, 471 S.E.2d 689 ("reprehensible") (overruled on other grounds by *State* v. *Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019)), cert. denied, 519 U.S. 972, 117 S. Ct. 402, 136 L. Ed. 2d 316 (1996). See generally *State* v. *Jackson*, 308 N.C. 549, 573, 304 S.E.2d 134 (1983) (noting general view that this tactic is "not morally justifiable or a commendable practice" (internal quotation marks omitted)).

These tactics are condemned not only because of their effect on the suspect but because they diminish society's perception of the honesty and legitimacy of the police. See *State* v. *Cayward*, supra, 552 So. 2d 975 ("We must . . . decline to undermine the rapport the police have developed with the public by approving participation of law enforcement officers in practices which most citizens would consider highly inappropriate. We think that for us to sanction the manufacturing

of false documents by the police would greatly lessen the respect the public has for the criminal justice system and for those sworn to uphold and enforce the law."); D. Young, supra, 28 Conn. L. Rev. 471 ("We entrust [the] police with the initial enforcement of our community standards, in the form of our criminal laws. When [the] police themselves misstate and violate the standards, even when that violation does not rise to a criminal level, they undermine their own role within the community."); D. Young, supra, 468–69 ("Police lying also generates a systemic loss of integrity. Research and analysis by ethicists and philosophers [remind] us of the impact of lying on society and societal perceptions of such lying. . . . Truth from doctors, truth from business people, and truth from government officials are essential for us to plan our lives and to maintain control over our choices. We condemn lying in personal affairs and criminalize it in many contexts. . . . We condemn lying in part because we recognize that lying manipulates. If we want people to make free choices, we do not want them manipulated through lying." (Footnotes omitted.)).

Sanctioning lying in interrogations adds fuel to the current crisis in trust and confidence in the police, as reflected in nationwide protests. See S. Klein, "Transparency and Truth During Custodial Interrogations and Beyond," 97 B.U. L. Rev. 993, 998–99 (2017) ("[W]e have reached a point where there is little trust in law enforcement and the criminal justice system writ large. Rioting in Ferguson, Missouri and Charlotte, North Carolina is a serious symptom of this distrust. In fact, only about [one] half of Americans report confidence in the police." (Footnotes omitted.)); K. Momolu, supra (71 percent of black Americans surveyed in 2020 reported "know[ing] 'some' or 'a lot of' people who were treated unfairly by the police").

Legitimizing this unethical conduct also could encourage the police to adopt the pernicious attitude that the end justifies the means, which, in turn, could be used to justify other dishonest acts when the police are equally convinced of a suspect's guilt, such as lying in affidavits to support search or arrest warrants, planting evidence, and offering false testimony.[34] See *State v. Cayward*, supra, 552 So. 2d 975 ("[W]ere we to approve the conduct [by the police fabricating false evidence], we might be opening the door for [the] police to fabricate court documents, including warrants, orders, and judgments. We think that such a step would drastically erode and perhaps eliminate the public's recognition of the authority of court orders, and without the citizenry's respect, our judicial system cannot long survive.");[35] *Darity* v. *State*, 220 P.3d 731, 738 n.1 (Okla. Crim. App. 2009) (Chapel, J., dissenting) ("Courts have opened a Pandora's box by sanctioning police lies. The 'ends justify the means' rationale employed by most courts is very difficult to limit, and thus, the circum-

stances of 'permissible deceit' have increased. So too has the evidence of 'unlawful deceit.' How does a law enforcement officer accept a message that it is permissible to lie to obtain evidence, but not permissible to lie in a suppression hearing when the conviction or release of a murderer is in the balance. Empirical studies demonstrate that police are lying both in and out of court. . . . The consequences penetrate deep into the criminal justice system, as the authority of the courts and legitimacy of their rulings are based largely on integrity and trust." (Citations omitted.)); A. Clemens, Note, "Removing the Market for Lying Snitches: Reforms To Prevent Unjust Convictions," 23 Quinnipiac L. Rev. 151, 192 (2004) ("[A]n officer [may grow] 'convinced that the suspect is factually guilty of the offense, may believe that necessary elements of legal guilt are lacking [and feel] that he/she must supply the missing elements.' For example, one police officer explained how 'it is often necessary to "fluff up the evidence" to get a search warrant or [to] ensure conviction [so this] officer will attest to facts, statements, or evidence [that] never occurred or occurred in a different fashion.' Police officers rationalize these lies, often themselves criminal acts, 'because they are necessary to ensure that criminals do not get off on "technicalities." ' " (Footnotes omitted.)); D. Young, supra, 28 Conn. L. Rev. 463–64 ("The justification of lying for the public good . . . may readily transfer to other lies. The officer wants to convict the criminal, punish him, and protect other potential victims throughout the officer's involvement in the case, not just during interrogation. For example, an officer may extend this justification to lying on a warrant affidavit for a search. . . . The officer's motives may also trigger lies to third parties, such as to encourage consent for a search or to encourage false testimony by others. . . . In an even more egregious application of this justification, an officer may lie at trial, committing perjury to obtain the conviction of someone he believes is guilty. . . . The inherent problem with lying for the public good is that people who believe their entire work is for the public good, as police officers do and should, may use this rationale to justify any and all lies that they tell . . . ." (Footnotes omitted.)).

Beyond concerns about the practical consequences of sanctioning lying, there are moral and ethical concerns. "[S]tate officials, at least in a democracy, must aspire to be relevant epistemic authorities on the law and on at least that aspect of morality embodied in law. We *should* be able to rely on their transmissions about the content of law, legally relevant morality, and legally relevant facts. These ideas would render police misrepresentation—even to a wrongdoer—especially morally problematic. If their role partly involves serving as a reliable epistemic repository, then the police subvert their own role when they misrepresent the content of

the law, the moral severity of an offense, or the evidence they have collected. . . . Because their epistemic responsibilities are bound together with and frame their investigatory aims, the police cannot argue that the mere significance of the end justifies the suspension of the truthfulness presumption." (Emphasis in original.) S. Shiffrin, Speech Matters: On Lying, Morality, and the Law (2014) p. 198; see also *Miranda* v. *Arizona*, supra, 384 U.S. 479–80 (" 'Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our [g]overnment is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the [g]overnment becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means . . . would bring terrible retribution. Against that pernicious doctrine this [c]ourt should resolutely set its face.' "), quoting *Olmstead* v. *United States*, 277 U.S. 438, 485, 48 S. Ct. 564, 72 L. Ed. 944 (1928) (Brandeis, J., dissenting).

Despite the aforementioned concerns, there are those who would argue that allowing the police to lie, at least in interrogations, is a necessary evil. Confessions undoubtedly may be essential in some cases. See *Moran* v. *Burbine*, 475 U.S. 412, 426, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986) ("[a]dmissions of guilt are more than merely desirable . . . they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law" (citation omitted; internal quotation marks omitted)); see also *McNeil* v. *Wisconsin*, 501 U.S. 171, 181, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991) ("the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good"). But, although confessions may be essential proof in some cases, it does not follow that lying to obtain those confessions is equally necessary.

There is a wealth of evidence that nonconfrontational interrogation methods, which do not sanction lying to suspects, are at least as effective as inquisitorial, adversarial methods like the Reid method. This evidence is found in empirical research; see *Dassey* v. *Dittmann*, supra, 877 F.3d 335–36 (Rovner, J., dissenting); M. Kim, supra, 52 Gonz. L. Rev. 517; S. Tekin et al., "Interviewing Strategically To Elicit Admissions from Guilty Suspects," 39 Law & Hum. Behav. 244, 244–46 (2015); the practices of other countries that have successfully shifted from the inquisitorial, adversarial Reid method to information gathering, conversational models; see M. Kim, supra, 513 (England); W. Kozinski, supra, 16 Seattle J. Soc. Just. 333–34 (United Kingdom, Norway, and New Zealand); Royal Canadian Mounted Police,

The Art of an Effective Interview: Why Non-Accusatory Is the New Normal, (January 13, 2017), available at http://www.rcmp-grc.gc.ca/en/gazette/the-art-an-effective-interview (last visited July 19, 2021) (Canada); and the adoption of rules by foreign courts prohibiting misrepresentation of evidence. See C. Slobogin, "An Empirically Based Comparison of American and European Regulatory Approaches to Police Investigation," 22 Mich. J. International L. 423, 443–44 (2001) (English and German courts developed special rules barring deception).[36]

One of our nation's largest police departments, the Los Angeles Police Department, is in the process of abandoning Reid style interrogation methods in favor of nonconfrontational techniques developed by the High-Value Detainee Interrogation Group (known as HIG), a joint effort of the Federal Bureau of Investigation, the Central Intelligence Agency, and the Pentagon, created to conduct noncoercive interrogations. See R. Kolker, The Marshall Project, Nothing but the Truth: A Radical New Interrogation Technique Is Transforming the Art of Detective Work: Shut Up and Let the Suspect Do the Talking (May 24, 2016), available at https://www.themarshallproject.org/2016/05/24/nothing-but-the-truth#.gR9TabJrx (last visited July 19, 2021).

To those who would argue that we must permit lying during interrogations because we sanction lying in other contexts that are necessary for effective law enforcement (i.e., undercover activities, use of informants, etc.); see, e.g., *Sheriff, Washoe County* v. *Bessey*, 112 Nev. 322, 328, 914 P.2d 618 (1996); L. Magid, "Deceptive Police Interrogation Practices: How Far Is Too Far?," 99 Mich. L. Rev. 1168, 1182 (2001); there are fundamental distinctions in those other circumstances that may justify different treatment. Those circumstances do not involve actions by the police presenting themselves as officers of the law, or the use of psychologically coercive tactics to pressure the suspect to make inculpatory statements.[37]

The broad societal harms caused by allowing the police to lie during interrogations, along with the risk of false confessions, may support a per se ban on this practice, whether as a matter of legislation action or the exercise of the court's supervisory authority. The best course of action would be for our state and local police to abandon this tactic before such action is necessary, as some police departments in other states already have done. To be clear, I do not presently suggest that we adopt so extreme a rule as a per se ban. For now, it is sufficient to lay out concerns that should be considered, in a future case, when deciding whether this court should give this particular tactic greater weight in assessing whether the defendant's confession was coerced. For the reasons stated in part II of this opinion regarding the many other coercive tactics applied in

the present case in conjunction with the false evidence ploy, I cannot agree with the majority's conclusion that the defendant's confession was voluntary under the totality of the circumstances.

I respectfully dissent in part.

[1] I agree with part I of the majority opinion, in which the majority concludes that the search of the home of the defendant, Bobby Griffin, that resulted in the seizure of the rifle and ammunition was not unconstitutional.

[2] The defendant was told, "if you don't [explain why it happened] and you sit there *and you keep* [*your*] *mouth shut*, it's just gonna get worse, it's gonna get worse and worse," and, "if you wanna spend the rest of your life in prison and sit there *and keep your mouth shut*, that's fine." (Emphasis added.) Although the majority is correct that courts often give significant weight to a valid waiver of *Miranda* rights in assessing the voluntariness of a confession, that waiver should be entitled to less weight when the interrogators effectively attempt to dissuade the defendant from exercising his right to revoke that waiver. See *United States* v. *Harrison*, 34 F.3d 886, 891–92 (9th Cir. 1994) ("there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor" (emphasis in original)); *United States* v. *Leon Guerrero*, 847 F.2d 1363, 1366 n.2 (9th Cir. 1988) ("threatening to inform the prosecutor of a suspect's refusal to cooperate violates [the suspect's] fifth amendment right to remain silent"); *Beavers* v. *State*, 998 P.2d 1040, 1045–46 (Alaska 2000) ("A criminal suspect's right to remain silent in the face of police interrogation represents one of the most fundamental aspects of our constitutional jurisprudence. It includes the right to terminate an interrogation at any time. We regard any potential encroachment upon this right with the utmost concern. A law enforcement officer's threat of harsher than normal treatment—however phrased—essentially conveys to criminal suspects that they will be punished for their silence, including any refusal to give further answers. . . . Suspects are told, in effect, that they must give up their constitutional right to silence or they will suffer greater punishment. We view such threats with disfavor. Where they are used, the resulting confession should be considered involuntary unless the state can show affirmatively that the confession was voluntarily made." (Footnotes omitted.)). See generally 23 C.J.S. 222, Criminal Law § 1269 (2006) ("[a] waiver of [*Miranda*] rights may be revoked"). Plainly put, "*Miranda* warnings do not immunize statements obtained during custodial interrogations from being the product of coercion." *State* v. *Baker*, 147 Haw. 413, 434, 465 P.3d 860 (2020).

[3] The full quote of this statement, set forth in part I B of this opinion, makes clear that the interrogator was contrasting felony murder to manslaughter, not simple murder.

[4] Part III of this opinion addresses how training methods are beginning to shift from adversarial, Reid type models to nonadversarial models in light of concerns about the effectiveness of the Reid method and its capacity to cause false confessions. Alan Hirsch, chair of the justice and law studies program at Williams College and author of articles examining the Reid method, testified for the defense at trial as an expert on this type of method and how it can affect the reliability of a confession.

[5] "An organization called John E. Reid & Associates [Inc.] developed the method in the mid-twentieth century and has since trained more interrogators than any other organization in the world. The Reid Technique is codified in Criminal Interrogation and Confessions (otherwise known as the 'Reid Manual'), a handbook that is frequently termed 'the bible of modern police interrogation training.' Over the past several decades, the Reid Manual's approach to interrogation has shaped 'nearly every aspect of modern police interrogations, from the setup of the interview room to the behavior of detectives.' " (Footnotes omitted.) K. Wynbrandt, Comment, "From False Evidence Ploy to False Guilty Plea: An Unjustified Path to Securing Convictions," 126 Yale L.J. 545, 549 (2016); see also *Dassey* v. *Dittmann*, supra, 877 F.3d 335–36 (Rovner, J., dissenting).

[6] The nine steps are: (1) "The Direct, Positive Confrontation," (2) "Theme Development," (3) "Handling Denials," (4) "Overcoming Objections," (5) "Keeping the Suspect's Attention," (6) "Handling the Suspect's Passive Mood," (7) "Presenting the Alternative Question," (8) "Bringing the Suspect into the Conversation," and (9) "The Written Confession." F. Inbau et al., supra, p. 215.

[7] "Leo is an [a]ssociate [p]rofessor of [l]aw at the University of San Fran-

cisco School of Law and formerly a professor of psychology and criminology at the University of California, Irvine. . . . He has written five books and more than fifty articles on police interrogation practices, false confessions, and wrongful convictions. . . . Leo holds both a J.D. and a Ph.D. in [j]uris-prudence and [s]ocial [p]olicy (with a specialization in criminology and social psychology)." (Citations omitted.) B. Gallini, "Police 'Science' in the Interrogation Room: Seventy Years of Pseudo-Psychological Interrogation Methods To Obtain Inadmissible Confessions," 61 Hastings L.J. 529, 570 n.335 (2010). Leo, "a highly respected expert in the area of police interrogation practice, the psychology of police interrogation and suspect [decision making], psychological coercion, false confessions, and wrongful convictions," has also "consulted on more than 900 cases involving disputed interrogations, qualified as an expert witness 168 times in state, federal, and military courts, and has testified for both the prosecution and defense, as well as in civil cases." *Ex parte Soffar*, Docket Nos. WR-29980-03 and WR-29980-04, 2012 WL 4713562, *9 (Tex. Crim. App. October 3, 2012) (Cochran, J., concurring), cert. denied sub nom. *Soffar* v. *Texas*, 569 U.S. 957, 133 S. Ct. 2021, 185 L. Ed. 2d 885 (2013).

[8] A prefatory step is to place suspects in an unfamiliar, unsupportive, and stressful setting from which they will want to extricate themselves. See *Miranda* v. *Arizona*, supra, 384 U.S. 449–50; S. Kassin, "Inside Interrogation: Why Innocent People Confess," 32 Am. J. Trial Advoc. 525, 532 (2009); M. Kim, "When and Why Suspects Fail To Recognize the Adversary Role of an Interrogator in America: The Problem and Solution," 52 Gonz. L. Rev. 507, 510–11 (2016–2017).

[9] See, e.g., *Quartararo* v. *Mantello*, 715 F. Supp. 449, 461 (E.D.N.Y.) ("Evidence . . . procured [by way of a promise of leniency that was the equivalent of a promise of immunity] can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion. . . . This factor alone would make it difficult to conclude that the prosecution sustained its burden of proving by a preponderance of the evidence that the first confession was voluntary." (Citations omitted; internal quotation marks omitted.)), aff'd, 888 F.2d 126 (2d Cir. 1989); *United States* v. *Goldstein*, 611 F. Supp. 626, 632 (N.D. Ill. 1985) ("when the government misleads a suspect concerning the consequences of a confession, his statements are regarded as having been unconstitutionally induced by a prohibited direct or implied promise"); *People* v. *Weiss*, 102 Misc. 2d 830, 831–36, 424 N.Y.S.2d 844 (1980) (recognizing that totality of circumstances determines voluntariness but concluding that specific tactic of threatening defendant with loss of his business rendered statement involuntary). This does not mean that the totality of the circumstances is inapplicable in such a case. For example, there might be evidence that the tactic was not the motivating cause of the confession.

[10] The majority dismisses *Baker* as irrelevant because the Hawaii Supreme Court decided the case under the Hawaii constitution. See footnote 23 of the majority opinion. The case is not so easily swept aside. The Hawaii court, applying a "totality of the circumstances" test, relied on settled *federal* constitutional case law and principles, as well as case law from other jurisdictions relying on the *federal* constitution, to reach its conclusion. See *State* v. *Baker*, supra, 147 Haw. 424–34. I do not rely on *Baker* for any principles grounded in state constitutional law but for the unremarkable proposition, supported by a wealth of authority rooted in the federal law cited in part II of this opinion, that the totality of the circumstances test requires the consideration of the cumulative effect of the interrogation tactics. The majority's rejection of this principle as stated in *Baker*, therefore, requires it to distinguish that federal authority; it has not done so.

[11] The individual tactics identified in *Baker* were "(1) the comments suggesting the public and media would perceive [the defendant] more favorably if he confessed; (2) the implication that [the defendant] would be perceived less favorably in court if he continued to deny guilt; (3) the minimization narratives suggesting the conduct was understandable because of the drugs and alcohol involved; (4) the use of unlawfully discriminatory [gender based] stereotypes to excuse or explain conduct; (5) the use of the false friend technique; (6) the insinuation that [the defendant's] refusal to admit to assaulting the [complaining witness] would be set forth in the detective's report and could adversely affect him; and (7) the detective's false assertion that there was incontrovertible DNA evidence showing that [the defendant] had sex with the [complaining witness], which, as the detective testified at trial, was told to [the defendant] to '[try] to get the truth out of him.' " *State* v. *Baker*, supra, 147 Haw. 433.

[12] In part III of this opinion, I address the broader policy concerns and ethical implications of sanctioning police lying in interrogations.

[13] In part III of this opinion, I give examples of cases in which a false confession was obtained after the police, along with the use of other coercive tactics, lied to the defendant about inculpatory evidence.

[14] The defendant ultimately was charged with both felony murder and murder. Although treating the shooting as an "accident" would be relevant to the murder charge because the absence of proof of intent to cause death would support only a conviction of manslaughter; see General Statutes §§ 53a-54a and 53a-55; the clear import of the interrogator's comments was that the defendant could also avoid a *felony murder* charge if he admitted that the shooting occurred by accident or in self-defense, as the interrogators proposed. See also footnote 18 of this opinion (addressing false charging choice proposed to defendant). This representation was blatantly false.

[15] John E. Reid & Associates, Inc., has responded to critics of its method in a posting on its website entitled "Clarifying Misinformation about The Reid Technique," which states: "The Reid [t]echnique teaches that the investigator should not offer any direct or *implied* promises of leniency to the subject." (Emphasis added.) John E. Reid & Associates, Inc., Clarifying Misinformation about the Reid Technique, p. 2, available at http://www.reid.com/pdfs/20120311.pdf (last visited July 19, 2021).

[16] Massachusetts is one of a handful of jurisdictions that requires the state to prove voluntariness beyond a reasonable doubt rather than by the preponderance of the evidence standard applied by the United States Supreme Court. However, that fact does not negate the relevance of Massachusetts case law regarding what constitutes coercive conduct. See *Commonwealth* v. *Baye*, supra, 462 Mass. 255 n.11 ("[o]ur cases remain broadly consistent with United States Supreme Court precedent on the voluntariness of statements made to [s]tate actors, except that we require the [c]ommonwealth to meet a heightened burden of proof in demonstrating voluntariness").

[17] See *Rogers* v. *State*, 289 Ga. 675, 678–79, 715 S.E.2d 68 (2011) (telling defendant " 'you are not trying to help yourself' " did not make confession involuntary because exhortation to tell truth and telling suspect that truthful cooperation may be considered by others is permissible); *State* v. *Flowers*, 204 So. 3d 271, 280 (La. App. 2016) ("a confession is not rendered inadmissible because officers 'exhort or adjure' an accused to tell the truth"), writ denied, 224 So. 3d 983 (La. 2017); *State* v. *Thomas*, 711 So. 2d 808, 811 (La. App. 1998) ("a mild exhortation to tell the truth, or an indication that if the defendant cooperates the officer will 'do what he can' or 'things will go easier,' will not negate the voluntary nature of a confession"), writ denied, 747 So. 2d 8 (La. 1999).

[18] The falsity of the representation is especially extreme in the present case because the homicide occurred during the course of a robbery (or attempted robbery), which, as the interrogators correctly informed the defendant, exposed him to a felony murder charge. Consequently, this was not simply a case in which the interrogators falsely indicated that the defendant's confession to an accidental shooting would result in a manslaughter charge, when the choice of charges actually would be a matter left entirely to the prosecutor's discretion (i.e., misrepresentation of fact). Rather, the interrogators affirmatively misled the defendant by telling him that the accident/self-defense narrative proposed to him was relevant and material to his criminal exposure for felony murder, which was untrue *as a matter of law*.

[19] The Reid Manual itself provides: "The important question to answer is whether it is human nature to accept responsibility for something we did not do in the face of contrary evidence. . . . Would a suspect, innocent of a homicide, bury his head in his hands and confess because he was told that the murder weapon was found during a search of his home? Of course not! However, consider that such false statements were then used to convince the suspect that regardless of his stated innocence, he would be found guilty of the crime and would be sentenced to prison. Further, the investigator tells the suspect that if he cooperates by confessing, he will be afforded leniency. Under these conditions it becomes much more plausible that an innocent person may decide to confess—not because fictitious evidence was presented against him, but because the evidence was used to augment an improper interrogation technique (the threat of inevitable consequences)." F. Inbau et al., supra, pp. 428–29.

[20] In his motion to suppress his statement, the defendant represented that his suppression hearing would show that he is of limited intelligence and

highly susceptible to suggestion. For reasons that are not apparent from the record, the defendant did not present support for this assertion until his sentencing hearing, when he submitted a psychological evaluation indicating that he has an intelligence quotient (IQ) score between 80 and 85—low average—with mild, intellectual impairments, corresponding to a " 'mental age' " equivalency of fourteen years, and a tendency to cede to authority or social pressure. The trial court's only reference to the evaluation was in connection with the characterization of the crime as "an impetuous decision." The court concluded that "[the defendant's] conduct *during this crime and the aftermath of the crime*, in the court's view, clearly contradicts and undermines [the psychologist's] statements [in the evaluation] that the defendant . . . was likely to be nonassertive and [to] adapt socially to his surroundings. He certainly did not [cede] control to other people based on the court's view of the credible evidence that was presented." (Emphasis added.) The majority infers from the trial court's failure to specify what it meant by "aftermath of the crime" that it means every action taken by the defendant after the crime occurred, including his conduct in the interrogation, and thus the court made a wholesale rejection of the psychologist's opinion. See footnote 28 of the majority opinion. I believe that the context plainly indicates otherwise. I also note that the court made no mention of the psychologist's assessment of the defendant's IQ and mental age.

[21] The trial court and the majority, in assessing the voluntariness of the defendant's confession, ascribe significance to the fact that the defendant maintained a calm demeanor throughout the interrogation. This view conforms to case law that implicitly assumes that a person's external demeanor provides a reliable indication of his or her internal emotional state during an interrogation, and, thus, a calm demeanor suggests the absence of coercion. This unexamined assumption strikes me as dubious at best. We now know that a subject's external appearance may not accurately reflect his or her internal reality. See A. Vrij, Detecting Lies and Deceit: The Psychology of Lying and the Implications for Professional Practice (2000) p. 38 (summarizing scientific evidence showing that observable behavioral cues assumed to indicate deceit do not do so). We also know that cultural differences between the subject and the observer greatly increase the likelihood that the subject's external demeanor will be misconstrued. See J. Simon-Kerr, "Unmasking Demeanor," 88 Geo. Wash. L. Rev. Arguendo 158, 161 (2020) ("Demeanor is understood to be a guide to a [witness'] credibility in the sense that we can 'read' it for clues to a person's truthfulness. Probing behind this assumption reveals it to be both culturally mediated and without basis in science, rather than reflecting a truism about human beings. Other cultures have different expectations about the revelatory nature of demeanor that, in turn, reflect different beliefs about the relationship between the internal and the external.").

One important example of this phenomenon is documented in a substantial body of literature indicating that it is not uncommon for individuals growing up in a violent home or neighborhood, as the defendant in the present case did, to adopt a mask of unemotional fearlessness as a coping mechanism. See, e.g., N. Dowd, "Black Boys Matter: Developmental Equality," 45 Hofstra L. Rev. 47, 93 (2016) ("[b]ravado is particularly the response in high risk neighborhoods for self-protection"); S. Dworkin, "Masculinity, Health, and Human Rights: A Sociocultural Framework," 33 Hastings International & Comp. L. Rev. 461, 474 (2010) ("marginalized men may be [overly reliant] on garnering identity through narrow definitions of masculinity in order to garner status and respect"); M. Thomas, "The African American Male: Communication Gap Converts Justice into 'Just Us' System," 13 Harv. BlackLetter L.J. 1, 9 (1997) ("'[c]ool pose is a distinctive coping mechanism that serves to counter, at least in part, the dangers that black males encounter on a daily basis' "), quoting R. Majors & J. Billson, Cool Pose: The Dilemmas of Black Manhood in America (1992) p. 5; see also R. Klein, Trial Practice Series: Trial Communication Skills (2d Ed. 2020) § 4:4 ("In truth, the feelings are always there, but for one reason or another, they are masked. With men, an open display of emotion is usually considered a sign of weakness. To be in control, to show no feelings, to act 'cool' in the face of any threat is considered manly."); M. Dargis & M. Koenigs, "Witnessing Domestic Violence During Childhood Is Associated with Psychopathic Traits in Adult Male Criminal Offenders," 41 Law & Hum. Behav. 173, 174 (2017) ("[E]xposure to community violence is directly correlated with callous-unemotional traits in detained juveniles. Moreover, this violence exposure mediates the relationship between callous-unemotional traits and delinquency, suggesting that witnessing violent acts account[s] for the relationship between callous-

unemotional traits and heightened risk for engaging in violent behavior."); cf. *State* v. *Purcell*, 331 Conn. 318, 356–57, 203 A.3d 542 (2019) (acknowledging sociolinguistic research concluding that "indirect speech patterns are common within African-American spoken language" and are used as linguistic mechanism to avoid conflict (internal quotation marks omitted)).

I do not profess to know what psychological, emotional, and cultural factors actually lay behind this defendant's calm demeanor. My point is that I have no way to know or even guess, *and neither does the trial court or the majority.* That said, at least two aspects of the record make my alternative scenario plausible. First, one of the officers said to the defendant, well into the interrogation, "I think you're putting a tough guy front on," indicating that the interrogators themselves perceived the defendant to be wearing precisely the type of mask identified in the research studies. Second, the defendant's background places him within the demographic referenced in those studies. He had committed four felonies by the age of eighteen, and he reported "a significant family history of drug addiction and related criminal behavior in [his] first degree relatives" and described "violence in the home [and] exposure to violence as a youth in the streets (including shootings and stabbings) . . . ."

The fact that the latter information was not made known to the trial court until sentencing does not undermine my point, but reinforces it: no judge can even begin to understand the meaning of a defendant's calm demeanor during an interrogation without knowing much more about him or her. As a consequence, there is simply no basis to be confident that the defendant's "cool" demeanor signified internal calm rather than masked distress, and, in my view, it is a mistake to give weight to this consideration under these circumstances.

[22] The majority also mischaracterizes my reasoning, but I rely on footnote 21 of this opinion to make my position clear.

[23] Even in the context of using demeanor to assess credibility—an assessment made in an adversarial proceeding, not an interrogation—courts have begun to recognize that cultural differences and other factors may impact demeanor and, in turn, our ability to draw accurate inferences from appearances. See, e.g., *Djouma* v. *Gonzales*, 429 F.3d 685, 687–88 (7th Cir. 2005) ("[A]s a foreigner [the asylum applicant's] demeanor will be difficult for the immigration judge to 'read' as an aid to determining the applicant's credibility. . . . The [United States Department of Homeland Security and the United States Department of Justice] seem committed to [case-by-case] adjudication in circumstances in which a lack of background knowledge denies the adjudicators the cultural competence required to make reliable determinations of credibility."); see also *Yang* v. *Lynch*, 832 F.3d 817, 821 (7th Cir. 2016) ("we've commented on the unreliability of demeanor evidence generally . . . and the particular difficulty of using such evidence to evaluate the credibility of witnesses from other cultures" (citations omitted)), citing *United States* v. *Pickering*, 794 F.3d 802, 805 (7th Cir. 2015), and *Djouma* v. *Gonzales*, supra, 687; *Morales* v. *Artuz*, 281 F.3d 55, 61 and n.3 (2d Cir.) (acknowledging that idea that demeanor is useful basis for assessing credibility is "grounded perhaps more on tradition than on empirical data" and citing articles reviewing social science research), cert. denied sub nom. *Morales* v. *Greiner*, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

[24] The majority interprets the interrogator's statement "[t]he choice is yours" as a simple assertion "that it was [the defendant's] choice whether to tell the truth." Footnote 24 of the majority opinion. The flaw in this interpretation is that it ignores what the officer actually said. The "choice" confronted by the defendant was expressly tied to the charges his "choice" would determine: "The choice is yours. Murder, manslaughter. *That's* your choice." (Emphasis added.)

[25] My conclusion in part II of this opinion makes it unnecessary to decide whether the modest doctrinal reform that I propose in part III could be implemented as a matter of state constitutional law or in the exercise of this court's supervisory authority. I note that several of the considerations discussed in part III bear directly on some of the factors that are employed to determine whether our state constitution affords greater protection than the federal constitution. See *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992) (setting forth six factors that, to extent applicable, are to be considered in construing contours of state constitution). "Although, in *Geisler*, we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. . . . [Moreover], not every *Geisler* factor is relevant in all cases." (Internal quotation marks omitted.) *Kerrigan* v.

*Commissioner of Public Health*, 289 Conn. 135, 157, 957 A.2d 407 (2008).

[26] In *Frazier*, the one lie told to the defendant was not made in concert with any other potentially coercive tactic, and the defendant confessed approximately one hour after the interrogation commenced. See *Frazier* v. *Cupp*, supra, 394 U.S. 737–38.

[27] "As of June 7, 2016, [t]he National Registry of Exonerations had collected data on [1810] exonerations in the United States since 1989 (that number as of December 4, 2017 is [2132]), and that data [include] 227 cases of innocent people who falsely confessed. This research indicates that false confessions (defined as cases in which indisputably innocent individuals confessed to crimes they did not commit) occur in approximately 25 [percent] of homicide cases." (Footnote omitted.) *Dassey* v. *Dittmann*, supra, 877 F.3d 332 (Rovner, J., dissenting). Interrogators themselves indicate that false confessions are surprisingly frequent. One self-report study of more than 600 professional interrogators found that the interrogators, based on their personal experiences and observations, estimated that, on average, almost 5 percent of innocent suspects confess. See S. Kassin et al., "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs," 31 Law & Hum. Behav. 381, 392–93 (2007).

[28] Some examples cited in the literature include: Anthony Gray confessed to rape and murder after a series of interrogations, during which detectives falsely informed him that two other men had confessed to involvement in the crime and had named Gray as the killer and that he had failed two polygraph tests. Gray spent more than seven years in prison "before he was exonerated on the basis of DNA evidence." K. Wynbrandt, Comment, "From False Evidence Ploy to False Guilty Plea: An Unjustified Path to Securing Convictions," 126 Yale L.J. 545, 545–46 (2016).

Marty Tankleff, then seventeen years old, confessed to killing his mother and beating his father after an interrogator lied about the evidence of his guilt, including that his father had said that he did it. His conviction was later vacated, and the charges were dropped. See S. Kassin, "Inside Interrogation: Why Innocent People Confess," 32 Am. J. Trial Advoc. 525, 536 (2009).

John Watkins confessed to rape after the police falsely told him that they had recovered his fingerprints from the crime scene, that the victim had identified him, and that he had failed a voice stress analysis test. He was later exonerated by DNA evidence. See S. Gross et al., National Registry of Exonerations, Government Misconduct and Convicting the Innocent: The Role of Prosecutors, Police and Other Law Enforcement (September 1, 2020) p. 56, available at https://www.law.umich.edu/special/exoneration/Documents/Government_Misconduct_and_Convicting_the_Innocent.pdf (last visited July 19, 2021).

Frank Sterling confessed to murder after officers falsely told him that his brother had implicated him and that he was justified in hurting the victim because she deserved it. Sterling was exonerated by DNA evidence that implicated another man. See id., p. 45.

Robert Miller, later exonerated, confessed after being falsely told by a detective that an eyewitness had seen him leaving the crime scene and that this witness had identified him in a photograph. See B. Garrett, "The Substance of False Confessions," 62 Stan. L. Rev. 1051, 1098 (2010).

In a recent opinion piece in the New York Times by three of the defendants convicted as part of the group known as the "Central Park Five," the authors explain how the interrogators' blatant lies—telling the defendants that the police had matched their fingerprints to crime scene evidence and telling each of them that the others had confessed and implicated each of them in the attack—contributed to their false confessions. See Y. Salaam et al., "Act Against Coerced Confessions," N.Y. Times, January 5, 2021, p. A19.

In a book by a former Washington, D.C., homicide detective, he examined how he could have elicited a confession from a suspect who he later proved could not have committed the crime. See T. Jackman, "Homicide Detective's Book Describes 'How the Police Generate False Confessions,' " Wash. Post, October 20, 2016, available at https://www.washingtonpost.com/news/true-crime/wp/2016/10/20/homicide-detectives-book-describes-how-the-police-generate-false-confessions/ (last visited July 19, 2021). "He realized that implying that [the suspect's] cooperation would get her better treatment from the prosecutors, and minimizing her role in the case to obtain her testimony against [her codefendants], as well as a mistaken handwriting analysis and a bogus 'voice stress test,' got her to confess." Id.; see also M. Gohara, supra, 33 Fordham Urb. L.J. 831 n.239 (providing examples of four other cases in which defendants falsely confessed after police lied about evidence inculpating them).

[29] The doubters argue that the empirical evidence does not demonstrate the frequency of the problem and may not accurately reflect proven cases of innocence; see, e.g., F. Inbau et al., supra, pp. 442–43; L. Magid, "Deceptive Police Interrogation Practices: How Far Is Too Far?," 99 Mich. L. Rev. 1168, 1192 (2001); suggest that false confessions are such a rarity that their risk may not outweigh the benefits of the questioned interrogation practices; see, e.g., *Dassey* v. *Dittmann*, supra, 877 F.3d 318 n.8; or point to the uncontested fact that social science experiments cannot replicate the high stakes context of an interrogation for a serious crime. See, e.g., F. Inbau et al., supra, p. 443; A. Hirsch, supra, 11 Ohio St. J. Crim. L. 805–808; S. Tekin et al., "Interviewing Strategically To Elicit Admissions from Guilty Suspects," 39 Law & Hum. Behav. 244, 251 (2015). These concerns have been addressed to my satisfaction in several sources, including *Dassey* v. *Dittmann*, supra, 331–33 (Rovner, J., dissenting), and A. Hirsch, supra, 806 n.18, 812–13, 825 n.129.

[30] Research also suggests that some innocent individuals may falsely confess voluntarily during police interrogations "because they believe that 'truth and justice will prevail' later even if they falsely admit their guilt." B. Garrett, "The Substance of False Confessions," 62 Stan. L. Rev. 1051, 1100 (2010); see, e.g., id., 1054–56 (Jeffrey Deskovic, exonerated of rape and murder with DNA evidence after making inculpatory statements, later explained that " '[b]elieving in the criminal justice system and being fearful for myself, I told [the police] what they wanted to hear' "). As I explain later in this opinion, this optimistic view of the criminal justice system is not universally shared.

[31] Several of the exonerated "Central Park Five" defendants recently explained: "It's hard to imagine why anyone would confess to a crime they didn't commit. But when you're in that interrogation room, everything changes. During the hours of relentless questioning that we each endured, detectives lied to us repeatedly. . . . It felt like the truth didn't matter. Instead, it seemed as though they locked onto one theory and were hellbent on securing incriminating statements to corroborate it. A conviction rather than justice felt like the goal." Y. Salaam et al., "Act Against Coerced Confessions," N.Y. Times, January 5, 2021, p. A19.

[32] A bill also was raised in Connecticut in 2014, which would have established a presumption that a statement made by a suspect as a result of a custodial interrogation is inadmissible if the police knowingly present the suspect with false evidence or knowingly misrepresent the evidence about the case. See Raised Bill No. 5589, 2014 Sess., § 1. Interestingly, in written testimony submitted to the Judiciary Committee, the Division of Criminal Justice successfully urged no action on the bill, suggesting that the courts should address this concern on a case-by-case basis under the current state of the law rather than adopt a per se rule. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2014 Sess., pp. 3564–65. That is precisely what this opinion advocates.

[33] Judge Rovner's dissent in *Dassey* is particularly notable because it was joined by two other Seventh Circuit judges. The four judges in the majority did not decide the issue raised in Judge Rovner's dissent because they concluded that that dissent's approach would not apply under the deferential standard that the federal court was required to apply to the review of a state court decision. See *Dassey* v. *Dittmann*, supra, 877 F.3d 302 ("[e]ven if we were to consider the approach in past [United States] Supreme Court decisions outmoded, as the dissents suggest, a state court's decision consistent with the Supreme Court's approach could not be unreasonable under [the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)]"). Chief Judge Wood wrote a separate dissent, arguing that the confession was involuntary despite the deferential standard of the AEDPA. See id., 319–31 (Wood, C. J., dissenting).

[34] The possibility that an end justifies the means mentality could result in some police officers committing perjury to advance what they perceive to be the greater public good is not hyperbole. Such conduct was sufficiently pervasive in New York City that police officers had their own name for the practice, "testilying"; see J. Goldstein, " 'Testilying' by Police: A Stubborn Problem," N.Y. Times, March 18, 2018, available at https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html (last visited July 19, 2021); and there is evidence that this conduct is not limited to that locale. "Judge Alex Kozinski of the Ninth Circuit has observed that it is 'an open secret long shared by prosecutors, defense lawyers and judges that perjury is widespread among law enforcement officers.' " I. Capers, supra, 83 Ind. L.J. 836–37. "Blue lies are so pervasive that even former prosecutors have

described them as 'commonplace' and 'prevalent.' Surveyed prosecutors, defense attorneys, and judges believed perjury was present in approximately [20] percent of all cases. A separate survey of police officers was even more sobering. Seventy-six percent of responding officers agreed that officers shade the facts to establish probable cause; [48] percent believed judges were often correct in disbelieving police testimony." (Footnotes omitted.) Id., 870; see also K. Holloway, "Lying Is a Fundamental Part of American Police Culture," Salon, March 31, 2018, available at https://www.salon.com/ 2018/03/31/lying-is-a-fundamental-part-of-american-police-culture_partner/ (last visited July 19, 2021); Editorial, "Police Perjury: It's Called 'Testilying,' " Chicago Tribune, July 5, 2015, available at https://www.chicagotribune.com/ news/opinion/editorials/ct-police-false-testimony-edit-20150702-story.html (last visited July 19, 2021).

[35] The Florida Appellate Court in *Cayward* made this statement when distinguishing between manufactured evidence and verbal lies, deeming the former coercive per se; see *State* v. *Cayward*, supra, 552 So. 2d 973–75; a distinction adopted by a few other courts. See *State* v. *Patton*, 362 N.J. Super. 16, 31–32, 826 A.2d 783 (App. Div.), cert. denied, 178 N.J. 35, 834 A.2d 408 (2003); *State* v. *Farley*, 192 W. Va. 247, 257 n.13, 452 S.E.2d 50 (1994). I agree with those courts that have rejected the proposition that a verbal lie about evidence will necessarily have less of an effect than presenting that same lie in physical form, i.e., false test results. See, e.g., *State* v. *Baker*, supra, 147 Haw. 431 ("[t]o the suspect, who does not expect the police to lie, there is no meaningful distinction between being given a piece of paper that purports to document guilt and an officer's confident assertion that scientific evidence incontrovertibly establishes the suspect's guilt"); see also M. Gohara, supra, 33 Fordham Urb. L.J. 833 ("Both sorts of official misrepresentation offend traditional notions of due process. Forgery and oral misrepresentation differ from one another only in degree rather than in kind.").

[36] It should be noted that, although there is evidence that the United Kingdom has a higher or similar rate of confessions as the United States; see C. Slobogin, "Lying and Confessing," 39 Tex. Tech L. Rev. 1275, 1282–83 and nn. 43 and 44 (2007); the United Kingdom permits the police to continue questioning suspects even after they have indicated a desire to remain silent and to tell suspects that their silence may be used against them. Id., 1282–83; see also C. Slobogin, supra, 22 Mich. J. International L. 446.

[37] See *Lewis* v. *United States*, 385 U.S. 206, 209, 87 S. Ct. 424, 17 L. Ed. 2d 312 (1966) (The court acknowledged, in the context of information obtained by an undercover agent, "that, in the detection of many types of crime, the [g]overnment is entitled to use decoys and to conceal the identity of its agents. The various protections of the Bill of Rights, of course, provide checks upon such official deception for the protection of the individual."); see also *Hoffa* v. *United States*, 385 U.S. 293, 302, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966) (use of government informant to obtain incriminating statements was not violation of fourth amendment when informant was invited to defendant's hotel suite and was not "a surreptitious eavesdropper," and defendant was relying on his "misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it").